[Crim. No. 5372. Second Dist., Div. One. Jan. 30, 1956.]

THE PEOPLE, Respondent, v. LOUIS A. SEARS, Appellant.

Forno & Umann and Harry M. Umann for Appellant.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information containing 19 counts, filed by the district attorney of Los Angeles County, defendants Louis A. Sears and Albert Kiers were accused in Count I of the crime of criminal conspiracy (Pen. Code, § 182, subd. 1) to violate the Corporate Securities Law (Corp. Code, §§ 25009 and 26104). Twenty overt acts were alleged. Counts II through XI, and Count XIII charged violations of the foregoing sections of the Corporations Code. In Count XII, and in Counts XIV through XIX, defendant Sears was accused of the crime of grand theft. Only Counts I and II are of concern on this appeal since all other counts were either dismissed on motion of the district attorney, or the respective defendants were found not guilty thereof.

Count I, charging conspiracy, alleged that continuously through the period of time from about the first of January, 1950, to the filing of the information (February 16, 1953), the named defendants conspired, combined, confederated and agreed together, and with each other, and with divers other persons to violate the Corporate Securities Law.

In Count II, which charged the substantive offense of violating sections 25009 and 26104 of the Corporations Code, it was alleged that on or about the 21st day of August, 1950, in the county of Los Angeles, California, they did wilfully, unlawfully, feloniously and knowingly sell, issue and cause to be sold for value in the sum of Two Hundred Fifty Dollars ($250.00) to one Cornie Bouma, a security, to wit: shares of stock in the Sierra Nevada Oil Company, a corporation, organized under the laws of the State of Nevada for profit, without first having applied for and secured from the Commissioner of Corporations of the State of California, a permit so to do. Defendants were duly arraigned, and each made a motion to dismiss under section 995 of the Penal Code, which motions were granted. The People appealed and the order of dismissal was reversed with directions to the court below to deny said motions (*People* v. *Sears,* 124 Cal.App.2d 839 [265 P.2d 683]). Upon the going down of the remittitur, defendants were rearraigned, pleaded not guilty as to all counts of the information, waived trial by jury, and the matter was submitted to the court upon a stipulated statement of facts, which also provided that all exhibits admitted at the preliminary examination were deemed admitted into evidence at the trial. Thereupon, the People rested and the defendants offered their evidence. After submission of the cause the court found defendants guilty on Counts I and II. Defendant Kiers was granted conditional probation and defendant Sears was sentenced to state prison. From the judgment of conviction defendant Sears alone prosecutes this appeal.

As to the stipulated statement of facts upon which the People relied for a conviction we regard the following, prepared by the attorney general, as a fair epitome thereof insofar as it pertains to Counts I and II upon which defendant Sears was found guilty. It is as follows:

"Exhibit 1 disclosed that Western Research Laboratories, Inc., a corporation, was organized and its articles of incorporation filed with the Secretary of State of the State of California on May 25, 1943. On November 25, 1949, an application, signed by appellant Sears, was filed by Western Research Laboratories, Inc. for a permit to sell and issue its shares of stock. On December 19, 1949, an amended application for such a permit was filed. Exhibit 2 is a certified photostatic copy of the Application for Permit and Decision

Abandoning Application. Exhibit 3 is a certified photostatic copy of the Amended Application.

"Appellant Sears, whose address was given as 2360 Midlothian Drive, Altadena, California, was listed in the application as one of the directors and he was named as an officer, i.e., Chairman of the Board. The principal place of business of the corporation was the address of Sears. The application (Exhibit 2) stated that the applicant was the owner of an oil and gas lease located north of the Cajon Pass in San Bernardino County commonly known as Yucca No. 1; that this lease was a community lease on approximately 750 acres on a one-eighth royalty basis; that the lease was assigned by the lessee to Sears and that it would be assigned to the corporation (Western Research Laboratories, Inc.); that an oil well had been drilled under the lease to a depth of 2,541 feet; that shares were to be sold to the public for cash at $50 per share not to exceed 2250 shares and as each share was sold and issued to the general public to issue not to exceed share for share to Sears. The application asked to sell only to residents of California.

"The amended application listed the same officers and directors and in addition stated that the sum of $14,900 had been invested by the corporation as received from various persons and that $5,421.67 had been invested by Sears. It was requested in the amended application that there be issuance of shares at $50 per share to those investors who were agreeable to the cancellation of their indebtedness by such means.

"Asa F. Harshbarger, a Deputy Commissioner in the office of the Corporations Commissioner of the State of California, whose duties included passing on applications for permits filed in the office of the Corporations Commissioner, met with the defendant Sears and his attorney late in 1949 or early in 1950. The application of Western Research Laboratories, Inc., after it was filed, was referred to Mr. Harshbarger and he discussed the terms of the application on more than one occasion with Sears and his attorney. The discussions were held in the office of the Corporations Commissioner after the date of the original filing of the application (November 25, 1949), and prior to the date of the abandonment of the application (April 26, 1950).

"Mr. Harshbarger prepared a proposed permit and made a memorandum of such proposal on or about March 2, 1950, and a written outline of the proposed permit was made. The

proposed permit was to provide that all outstanding shares of the Western Research Laboratories, Inc. were to be returned to the treasury and cancelled. The second portion of the proposed permit was to permit persons who had contributed moneys to the amount of $13,600 to receive shares for these contributions and in cancellation of such indebtedness and provided allowance of issuance of shares to the defendant Sears in cancellation of his indebtedness in the amount of $5,400, and provided that after this was done to allow the sale of shares to the person who had contributed to the original deal and desired to stay in and put up more money to further drill on the property. Provision was also made for stockholders of a company known as Knoll Groves Estates to be allowed to purchase a certain number of shares for further drilling on the oil well, and to issue promotion shares to the promoters, among whom was Sears. The proposed permit was to be conditioned that all shares would be escrowed so they could not be resold to the public and the owners of the promotion shares were to waive their rights to participate in the distribution of any assets on dissolution or to receive dividends until the people who had put in the money under the cash provisions had received from their returns near to the amount of their investment. All leases were to be turned over to the company covering the San Bernardino property.

"Thereafter Mr. Harshbarger received a letter from the attorney for the applicant withdrawing the application. Harshbarger was not informed of the formation of a Nevada corporation known as the Sierra Nevada Oil Company. This corporation was organized and existing under the laws of the State of Nevada. An exemplified copy of the articles of incorporation signed by Louis A. Sears was filed by him in the office of the Secretary of State of the State of Nevada on February 15, 1950 (Overt Act No. 1). This document is Exhibit 4. Exhibit 5 is an exemplified copy of the list of the officers of the Sierra Nevada Oil Company, which included Louis A. Sears, President, 2360 Midlothian Drive, Altadena, California.

"A desist and refrain order, dated March 23, 1951 (Exhibit 6), was prepared and issued by the Corporations Commissioner of the State of California and mailed to the defendants and to the Sierra Nevada Oil Company and directed the parties not to 'sell or offer for sale, negotiate for the sale of or deal in any of the shares or other securities of Sierra

Nevada Oil Company, a Nevada corporation, in the State of California, for the reason that the said Sierra Nevada Oil Company, a Nevada corporation, has no permit and for the further reason that in the opinion of the Commissioner of Corporations of the State of California the sale thereof is and would be unfair, unjust and inequitable to the purchasers thereof.'

"Specifically concerning Count II contained in the Information, Cornie Bouma, a dealer in dairy cattle who resided in Norwalk, County of Los Angeles, met defendant Kiers. Kiers said he was selling oil stock for Sierra Nevada Oil Company and talked to Bouma about an oil well in Cajon Pass in San Bernardino County. He said there were other investors and that Bouma should invest some money also He invited Bouma to go with him to be shown where the oil well was being drilled. Kiers took Bouma to the well site in Cajon Pass where the well was being drilled and there introduced Sears. Bouma asked Sears if they were going to hit oil and Sears replied 'My gamble was as good as his, and he didn't know it, but all indications were there.'

"Kiers asked Bouma to invest a thousand dollars in the stock of the company at $1.00 per share. Bouma declined. Thereafter, by a telephone appointment, Kiers came to Bouma's home and told him they were now selling stock two for one. Bouma then issued his check for $250 dated August 21, 1950, payable to Kiers (Overt Act No. 6). Bouma noted on the check that it was for 'cashier's check 500 shares in Sierra Nevada Oil Co.' This check endorsed by Kiers is Exhibit 7. Kiers had told Bouma that the money was wanted to finish the drilling of the oil well at Cajon Pass.

"Thereafter Bouma received by mail from Las Vegas at his home in Norwalk, Los Angeles County, 500 shares of stock in the Sierra Nevada Oil Company. Kiers told Bouma that he would get a cashier's check in exchange for Bouma's check and would get the stock and have it sent to Bouma; that it would be mailed from the Las Vegas office.

"Bouma visited the Sears home in Altadena on occasions when some 15 or 18 other people were present, including defendant Kiers (Overt Act No. 2). This was after the equipment had been moved from the Cajon Pass and the drilling there had stopped. Sears told them that the Cajon well went sour and that he had gotten leases on property in Wyoming; that they were drilling in this territory and Sears showed oil maps of the place of these operations.

"Sears told those assembled that it was easier to issue the stock in Nevada than in California because of the 'Securities Commissioner's Act.'

"One James P. Bremner met Sears at his home in Altadena along with one Thomas Morgan after he had purchased stock in Sierra Nevada Oil Company. He went to Sears' home with Morgan to learn of the possibilities of the oil well at Cajon. Bremner never had anything to do with Western Research Laboratories, Inc. Sears showed samples of the oil which Sears said came from the well and he said that this hole had been drilled by a California company. Sears told him he had invested $50,000 in the venture and that in the future was going to allow other people to invest because he, himself, was in no need of financial help and derived pleasure in helping others (Overt Act No. 3). Bremner then asked Sears how to acquire the stock. Sears gave Bremner instructions as to how to buy the stock of Sierra Nevada Oil Company by mailing the check to the company in care of its resident agent, George Marshall, at a given address in Las Vegas and told him that he would receive the stock by registered mail from Las Vegas.

"Bremner first purchased 100 shares of preferred stock and intermittently thereafter made other purchases totaling over $1,000. In making the first purchase he followed Sears' instructions and received certificates of stock from Las Vegas by registered mail in Los Angeles County. These certificates of preferred stock were returned to the company and exchanged for common stock. Exhibit 9 consists of three certificates of common stock issued to Bremner and one check payable to Sierra Nevada Oil Company. The certificates are signed by Louis A. Sears as President and George E. Marshall as Assistant Secretary. Each check which Bremner used to purchase stock was sent by him from Alhambra, in Los Angeles County, to Las Vegas by mail and he received his stock by mail in Los Angeles County from Las Vegas.

"Bremner had many conversations with Sears in the presence of defendant Kiers at the Sears' home, at the well site at Cajon Pass and by telephone. Bremner was appointed by Sears as Chairman of an Advisory Board and they held weekly or semi-monthly meetings at the Sears' home. Selling stock was the main activity of the Advisory Board. Sears was the guiding force for this Board and names of prospective stockholders were given to this Committee.

"Kiers went to Bremner's office at Bremner's request on or about January 30, 1951. Bremner had some information for Kiers. After giving Kiers the information, Kiers stated that he had an agreement with Sears wherein he, Kiers, would receive ten per cent in stock on the total amount of stock he sold and also that he had been receiving a $50 per week remuneration. (Overt Act No. 4.) Bremner did not know whether this was an advance or expense money. Kiers told him that he sold about $82,000 worth of stock and that if Bremner and Morgan would protect that equity, Kiers would agree to go along. Bremner had been told by Sears that the money being invested in stock was to be used for the drilling of an oil well and that there was no promotional stock or salaries paid. These statements were also made to Bremner by Kiers. Bremner assisted in compiling a letter dated October 30, 1950, concerning the abandonment of the Cajon well and the drilling in Wyoming and Bremner saw Sears sign the letter. This letter is Exhibit 10. Bremner also promoted sales of stock by recommending the purchase of stock to friends and relatives and told them that they could buy stock by mailing the checks made payable to the Sierra Nevada Oil Company to Las Vegas. Bremner recommended the sale of stock in excess of $10,000. He didn't recall whether the amount was over $50,000, but he did not sell as much stock as Kiers stated that he (Kiers) had sold. Bremner received no remuneration or commission for acting on the Advisory Board or for recommending the purchase of stock. Appellant Sears had suggested to him that all close friends and relatives be given the opportunity to participate in the prospect of profits from the purchase of shares of stock of the Sierra Nevada Oil Company.

"Bremner saw a mimeographed form of a letter concerning the purchase of stock at Sears' home. This letter is Exhibit 8 and was a form letter directed to the Sierra Nevada Oil Company in Las Vegas and used for the purpose of enclosing a check for the purchase of stock in the company, having blanks on the form for the indication of the name to whom the stock was to be issued and the address to which it was to be mailed. The form letter concluded with a note that the check was made payable to the Sierra Nevada Oil Company and was being sent air mail-special, and requested return of stock certificates by registered mail.

"One Robert L. Griffin, Jr., a resident of Sierra Madre, California, was President of the Griffin Company with place

of business in Bellflower, California. He met Kiers about September or October, 1950 when Kiers came to his office with some maps and a geodetical survey of certain oil bearing lands and oil leases near Worland, Wyoming. Kiers said that they were drilling an oil well at that time and he gave the names of some men in and around Bellflower who were interested. Kiers returned numerous times to report on further developments and showed four samples from the oil well being drilled. Kiers later took Griffin and his wife to meet Sears in the Sears' home and they were shown more maps on this occasion. Sears said the well was about ready to be brought in.

"Sears had told Griffin that the corporation was being organized in Nevada but had permission from the California Corporations Commissioner to operate in the State of California. Griffin issued a check for $2,500 payable to the Sierra Nevada Oil Company and dated December 16, 1950, and was told what he should do with it. Kiers had given Griffin several copies of Exhibit 8 (the form letter) and asked if he had friends who might be interested. Griffin filled in the form addressed to the Sierra Nevada Oil Company in Las Vegas and enclosed his check and sent it as directed in the form letter. Thereafter he received in Los Angeles County a certificate for 2500 shares of common stock. Griffin's check is Exhibit 11 and was mailed in Los Angeles County with the form letter (Exhibit 8) to Las Vegas.

"A similar method was used in getting one James Cristo to purchase shares of stock in the company. Cristo, a resident of Bellflower, met Kiers at Kiers' laundromat in Bellflower. About August of 1950 Kiers showed Cristo charts relating to oil. He introduced Cristo and his wife to Sears. Thereafter Cristo told Kiers that he would take 500 shares of stock. Kiers typed a letter which Cristo and his wife signed; they were each to receive 250 shares. On August 7, 1950, Cristo gave Kiers a cashier's check payable to the Sierra Nevada Oil Company, which Kiers sent by mail to Nevada. On August 9, 1950, Cristo received two certificates of stock by registered mail from George E. Marshall in Las Vegas, Nevada. (Overt Act No. 5.) Exhibit 12 is the envelope and two stock certificates. The certificates were signed by the same officers as in the previous exhibits.

"Likewise, one William R. Vogel, a resident of Bellflower and a member of the same church attended by Kiers, talked to Kiers at the laundromat in Bellflower sometime in May, 1950, about an oil venture. (Overt Acts 9 and 10.) Vogel

subsequently met Sears and made several investments in Sierra Nevada Oil Company stock. His first investment was for 750 shares for which he issued his check in Los Angeles County, payable to Sierra Nevada Oil Company, which he sent by mail to Las Vegas attached to the same form as Exhibit 8, the form letter. His check was dated June 5, 1950. He later received by mail in Los Angeles County a stock certificate of the Sierra Nevada Oil Company, signed by Marshall, Assistant Secretary, and appellant Sears, President. The check and certificate comprise Exhibit 13.

"Vogel also purchased 200 shares which he obtained by sending by mail from Los Angeles County, a form letter to Las Vegas accompanied by a check dated October 2, 1950, which was payable to the Sierra Nevada Oil Company. The check and the stock certificate which he received in return comprise Exhibit 14. Exhibit 15 is another check and stock certificate for 50 shares which he obtained in the same manner. Exhibits 16, 17, 18 and 19 consist of checks and stock certificates mailed from Los Angeles County to Nevada for the purchase of stock in the Sierra Nevada Oil Company. Exhibits 20 and 21 comprise checks and a note made out by Sears to Vogel, Sears having told Vogel that the corporation was short of funds and that no more stock was to be issued and that to continue operations Sears would put in his own money and that if people wished to do so they could make a personal loan to him, which would be put into the corporation for further development of the oil drilling activities in Wyoming; that he would give a personal note signed by himself and his wife; that this was a personal loan, but that if and when stock could be had they would get stock in place of the money loaned. (Overt Act No. 11.) A promissory note for $2,350 dated September 6, 1951, is marked Exhibit 21. Vogel never received any payment on the note or any stock in lieu of the note.

"A similar situation was evidenced by the testimony of Sidney Van Laar, who had known defendant Kiers for about a year. He had talked about an oil venture with Kiers, and Kiers had told him that he could invest in this venture. Kiers said that the drilling operation was at Cajon and that appellant Sears was President of the company. Van Laar and his wife went with Kiers to Cajon to see the drilling operation and there met appellant Sears. Sears told about the drilling of the oil well, and said that he (Van Laar) could make an investment. Later, in Los Angeles County,

Van Laar purchased a cashier's check in the amount of $400.00, dated August 11, 1950, payable to Sierra Nevada Oil Company, which he sent by mail to Las Vegas. Kiers gave Van Laar the address in Las Vegas to which he should send his money. Thereafter Van Laar received by mail in Los Angeles County a certificate for 400 shares of Sierra Nevada Oil Company. This certificate was signed by the same officers as the other certificates. Exhibit 22 consists of the check of Van Laar, the cashier's check purchased with it and the stock certificate.

"Van Laar made further investments in the stock of the Sierra Nevada Oil Company. (Overt Act No. 7.) Exhibit 23 is a money order and stock certificate for the purchase of these shares. Exhibit 24 is a money order in the sum of $200.00 payable to the Sierra Nevada Oil Company, which was mailed from Los Angeles County to Las Vegas. Exhibits 25, 26, 27 and 28 consist of money orders and certificates. Van Laar on three or four occasions went to Sears' home when others were present, including defendant Kiers. On one occasion Sears said the Sierra Nevada Oil Company was in litigation and that he was tied up and needed money for the operation of the company; that he was then bringing in a second well in which investors could make personal loans to him for which they were to get stock, if stock was available. Sears was to use the funds in the operation of the company. Van Laar purchased a cashier's check for a thousand dollars payable to Sears and received a promissory note from Sears dated September 6, 1951. Van Laar did not receive any payment on the note or any stock in lieu thereof. (Overt Act No. 8.) Exhibit 29 consists of the cashier's check and the note.

"Dr. Lawrence L. Kaylor, a dentist, residing in Long Beach, California, had occasion to go with his wife to appellant Sears' home in Altadena prior to October 14, 1950. On October 20, 1950, Dr.. Kaylor purchased a cashier's check for $800 payable to Sierra Nevada Oil Company. He sent this check by mail, accompanied by a completed form similar to Exhibit 8, which he had obtained at the Sears' home, to Sierra Nevada Oil Company in Las Vegas, Nevada. (Overt Act No. 16.) Thereafter Dr. Kaylor received by mail in Los Angeles a certificate for 800 shares of stock of Sierra Nevada Oil Company, dated October 23, 1950, and signed by the same officers as had signed the other certificates of shares of stock. Exhibit 30 consists of the personal check of Dr. Kaylor, the cashier's check and the stock certificate.

On the occasion of the visit to Sears' home there were approximately 50 people present and oil development was discussed. Sears did most of the talking but defendant Kiers also talked about the enterprise. Dr. Kaylor made other investments in stock in Sierra Nevada Oil Company in which he purchased cashier's checks and sent them by mail, accompanied by a completed form similar to Exhibit 8, to the Sierra Nevada Oil Company in Las Vegas. Thereafter he received by mail in Los Angeles County certificates for shares of stock in Sierra Nevada Oil Company signed by the same officers. Exhibits 31, 32, 33, 34, 35, 36, 37 and 38 consist of cashier's checks with requisitions and certificates received by Dr. Kaylor.

"Somewhere around April 3, 1951, Dr. Kaylor purchased the cashier's check for $5,000, which was made payable to appellant Sears. This check was endorsed 'for deposit only' by Sears and was mailed to Sears at Worland, Wyoming. Sears had said that the company needed money to stay in business and to buy equipment to operate. Dr. Kaylor advanced this money in an effort to possibly, at a later date, get stock. Sears had said that it was not legal to get it at that time.

"Dr. Kaylor attended a meeting about April 15, 1951 of the stockholders held in Vogel's home. Defendant Kiers was present at the meeting and talked about the progress in the oil field and said that he would be talking to Sears that night. Kiers put in a telephone call and all those present at the meeting talked to Sears. (Overt Act No. 17.) Sears told Dr. Kaylor that $16,000 additional money was needed for the further development of the field, that the advancing of more money would be done in the same manner and handled in the same way as the first advances with the promise of notes to be exchanged for stock if they could. Dr. Kaylor purchased on April 17, 1951, a cashier's check for $4,000, endorsed by him to the order of Sears and endorsed by Sears and the Stockgrowers State Bank at Worland, Wyoming. About two months later Dr. Kaylor received a note for $9,000 covering the advances, which note was signed by Sears only. Dr. Kaylor did not receive any payment on the note nor any stock covering the advances.

"One William C. Jacobs, a resident of Bellflower and a customer of defendant Kiers' laundromat, talked to Kiers about an oil venture in the middle of 1950. Kiers mentioned to Jacobs the names of Sierra Nevada and Western Research.

Jacobs went to Cajon Pass and saw Kiers there and met Sears. Kiers told Jacobs that he could invest in stock of the company. On June 29, 1950 Jacobs purchased a money order in the amount of $400 and mailed this money order to Las Vegas from Los Angeles County. (Overt Act No. 12.) Thereafter he received by mail in Los Angeles County a certificate for 400 shares of Sierra Nevada Oil Company stock, dated July 6, 1950, and signed by the same officers. (Exhibit 42 is a money order and requisition and the stock certificate.) Jacobs purchased additional stock by sending his checks from Los Angeles County to Nevada and thereafter received by mail in Los Angeles County certificates for shares of stock in the Sierra Nevada Oil Company signed by the same officers.

"Thereafter Jacobs went to Sears' home and attended stockholders' meetings. He was present at a meeting about April 1, 1951, at which the oil venture was discussed. Sears said that the stockholders were in dispute and that the funds were tied up and that they needed money to keep the field near Worland in operation and for its development. Sears explained that the company was going to keep in operation by the stockholders loaning Sears money and he would give them a personal note signed by himself and his wife and that he would take the money loaned, give it to the corporation and demand stock, and if he could get stock the stockholders would be repaid with stock, if possible, and if not the money would be returned. (Overt Act No. 13.) Jacobs made loans following this meeting. Thereafter he received a note from Sears. Subsequently another meeting of the stockholders was held at Vogel's home and Kiers said that more money was needed by Sierra Nevada Oil Company to continue its operation. Jacobs on this occasion talked with Sears on the telephone. Sears said in substance that he would accept loans from the stockholders as had been previously explained to them. Jacobs said that he would loan an additional $1,000. For this he received a promissory note dated September 6, 1951, for $1,000. Jacobs received no payment on the notes nor did he receive stock for the advances made.

"One Harm Bensema, a resident of Bellflower and a member of defendant Kiers' church, talked with Kiers about an oil venture. Bensema told Kiers he was willing to purchase stock but Kiers said he could not sell it because they had no license to sell Nevada stock in California. He told Bensema that he could acquire stock by sending for it himself. Bensema was invited to visit the drill site at Cajon Pass and he went

there with Kiers and Mr. and Mrs. Cristo where he was introduced to Sears. Both Kiers and Sears mentioned the name of the company as being Sierra Nevada Oil Company. Bensema made out a check, dated August 8, 1950, to Kiers for $500.45. He gave the check to Kiers and asked him to get a cashier's check and send it in requesting stock. (Overt Act No. 14.) The certificates were made to Bensema and his wife and to his sons. This stock was received by mail in Los Angeles County.

"Bensema attended several meetings at appellant Sears' home in Altadena. Kiers was present and both defendants gave pep-talks on the progress of the drilling of the wells. About April 1. 1951, Bensema was present at a meeting in Sears' home where Kiers and other investors were present. Sears gave a report on the drilling progress and said that the money put in previously had been used for the sole purpose of drilling the wells, that for some reason no more stock could be issued and that drilling would have to stop if they didn't have more money to go on. Sears asked that money be given to him on a personal note, to be turned over by him to Sierra Nevada Oil Company, that this money was needed to continue the drilling operation and investors were to receive stock if and when it could be issued. (Overt Act No. 15.) Sears was to issue his personal note signed by his wife and himself. After this meeting Bensema issued his check for $1,000 and gave or sent it to Sears. Thereafter he received a note in Los Angeles County signed by Sears only.

"Bensema attended a later meeting in Vogel's home with Kiers present when the long distance telephone call was made to Sears at Worland, Wyoming. After the meeting Bensema mailed a check to Sears at Worland, Wyoming, dated April 19, 1951, for $1,000 payable to Sears and endorsed by Sears 'for deposit only' to the account of Knoll Grove Estates in the Altadena Branch of the Security-First National Bank of Los Angeles. Sears never told Bensema about Knoll Grove Estates but Bensema later learned that it was a housing project or real estate venture. Bensema later received in Los Angeles County a note signed by Sears only. Bensema never received any payment on the notes or any stock in payment thereof.

"One Rex H. Kaylor, a resident of Long Beach, California, met Sears and Kiers in Las Vegas at a stockholders' meeting about March 14, 1951. On April 15, 1951, Kaylor went to

a meeting at Vogel's home at which Kiers was present with other stockholders. Kiers said that Sierra Nevada Oil Company needed some ready cash and that the meeting was called to raise $16,000. Kaylor talked by telephone to Sears on this occasion, Sears being in Worland, Wyoming. Kaylor told Sears he was willing to lend the company $10,000. (Overt Act No. 18.) Sears said he would give Kaylor a note and at some future date when and if it became legal Sears would receive stock dollar for dollar. Sears said it was not legal to issue stock at this time. On April 16, 1951, Kaylor mailed from Los Angeles County to Sears in Worland, Wyoming, a cashier's check for $10,000. Later Kaylor saw Sears in Worland, Wyoming, remaining there four or five days during which time he was taken out to the oil wells. At that time the driller reported the breaking of a bit and Sears wrote a check for $3,900 to pay for it. Sears then said they could use more money. Kaylor indicated that he could advance another $10,000 under the same conditions as the first loan. (Overt Act. No. 19.) Kaylor returned to Long Beach and purchased another cashier's check which he mailed to Sears with a letter of transmittal. This check, dated June 4, 1951, for $10,000 was endorsed by Sears. Kaylor received a note about June 20, 1951, covering the two advances. Subsequent advances were made by Kaylor under the same conditions. Kaylor never received any payments on the note nor did he receive any stock in payment of the notes. He did not receive any stock in Sierra Nevada Oil Company and at the time he loaned the money he knew he could not get stock but he was told by Sears that if Sears ever got stock issued to himself and Kaylor wanted stock in payment of the notes Sears would give him stock provided he was able to issue it lawfully. Sears had said that if he did not acquire the stock he would pay Kaylor the money back with interest. Kaylor lent the money to be used by the company.

"An examination was made in the office of the Division of Corporations of the State of California for any application signed or permit granted to sell stock or securities for the Sierra Nevada Oil Company and no record of such application or permit was found. No license as broker or agent was found in the name of Appellant Sears or Defendant Kiers. A certified public accountant who had made investments in Sierra Nevada Oil Company was present with Bremner at the time of the conversation with Kiers in which Kiers stated that Sears had promised a ten percent bonus in stock for all the stock that Kiers sold, that Kiers sold about $80,000 of

stock and therefore 8,000 shares were due him. Kiers also stated that he was getting $50 a week advance."

Defendant Sears testified that he purchased all of the outstanding stock of Western Research Company; that it was a going business and had assets and that Western Research Company owned no drilling site in the Cajon Pass area. He admitted contacting the Commissioner of Corporations to obtain a permit authorizing the corporation to drill at the Cajon Pass site; that he later abandoned this attempt and was instrumental in forming the corporation known as Sierra Nevada Oil Company under the laws of the State of Nevada. That this corporation owned a drilling site in the Cajon Pass area. He admitted the formation of the advisory committee referred to in the stipulated statement of facts. That practically all of the complaining witnesses were members of that committee, which held many meetings, and that the members thereof actually participated in the affairs of the corporation. Defendant Sears further testified that at these advisory committee meetings he usually addressed those present, but never "solicited any of those people to buy shares of stock"; that he would "give them the benefit of my honest thoughts, observations of the oil well, the drilling activities, and ask them for any advice that they could come up with." In answer to the question, "Did you have any understanding or agreement, direct or indirectly with Mr. Kiers or anybody else whereby they were to solicit the public for the sale of stock of the Sierra Nevada Oil Co.?" defendant Sears answered, "No sir, emphatically no." As to his reason for incorporating in the State of Nevada, defendant Sears testified: "Primarily, sir, the purpose of the Nevada corporation, its advantages, primarily, were taxwise. There is no state tax in the State of Nevada on corporations. The franchise tax in the State of Nevada is considerably less than it is in the State of California. Third, the filing fees are considerably less in the State of Nevada than they are in California. The service by reason of not handling as many cases is perhaps—as are handled through the California department— the service is remarkably faster. Those are the prime objectives. Time was of the essence and savings of money. The benefits of the corporation was of the essence, and that was the reason for the Nevada corporation, not for the purpose of evading California laws." Several character witnesses testified to the good reputation of defendant Sears.

As a first ground for reversal of the judgment appel-

lant contends that conspiracy to violate sections 25009 and 26104 of the Corporations Code is not criminally punishable as a crime of conspiracy within the purview of section 182, subdivision I of the Penal Code. This claim cannot be sustained. It was decided adversely to appellant by our Supreme Court in the case of *Doble* v. *Superior Court,* 197 Cal. 556 [241 P. 852], and again, the claim of appellant that there is no such crime in California as conspiracy to violate the Corporate Securities Act was held to be without merit in *People* v. *Eiseman,* 78 Cal.App. 223, 248 [248 P. 716].

█ Appellant earnestly argues that before one can be charged with a violation of the Corporate Securities Act the Commissioner of Corporations must first, from his analysis of the case, determine whether any of the provisions of section 26104 of the Corporations Code have been violated. We do not so interpret the law. Appellant urges that he was prosecuted for disobeying a "Desist and Refrain Order" issued on March 23, 1951, which forbade the Nevada corporation and appellant "to sell or offer for sale, negotiate for the sale of or deal in any of the shares or other securities of Sierra Nevada Oil Company, a Nevada corporation, for the reason that the Sierra Nevada Oil Company ∴ . . has no permit," etc. This is not correct. Such an order merely put appellant and his corporation on notice. Appellant was prosecuted for violation of the Corporate Securities Act which denounces as a crime the issuance or sale of any security without having first obtained from the Commissioner of Corporations a permit authorizing such sale or issuance of a security as that term is defined in the act. (Corp. Code, tit. 4, div. 1, § 26104.) █ As to the charge contained in Count I, the gist of a criminal conspiracy is a corrupt agreement between two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the objects of the illicit agreement.

██ We deem it unnecessary to here set forth the testimony contained in the stipulated statement of facts now before us because such statement was compiled from the transcript of the testimony given at the preliminary examination, and which transcript was before Division 2 of this court in the case of *People* v. *Sears, supra,* and as to Count I that court thus summarized the evidence, pages 842-847. The court pointed out that appellant and his codefendant Kiers acted in unison in attempting to gather in from the general public all available money by the sale and issuance of corporate

shares, or by accepting loans from persons zealous to make profitable investments; that while so conspiring to sell, and while selling the stock of their corporation, they were constantly conscious that they had not first gained the consent of the Division of Corporations or a written permit to make such sales. They often reminded their investors they had none. At page 849, in *People* v. *Sears, supra,* the court summarized the evidence as to Count II, upon which appellant was convicted. We are satisfied that the evidence herein was ample to support the conclusion of the trial court that appellant conspired with others to sell and sold stock in California as charged in Counts I and II as the term "sale" is defined in the Corporate Securities Law. Section 25009 of the Corporations Code provides that "sale" or "sell" includes every disposition, or attempt to dispose, of a security or an interest in a security for value. "Sale" or "Sell" is defined to include the following (whether done directly or by an agent or otherwise): "An offer to sell; an attempt to sell; a solicitation of a sale; an option of sale; a contract of sale; a taking of a subscription; . . ." (Corp. Code, § 26104)

The Corporate Securities Act clearly prohibits a foreign corporation from soliciting in California a sale of stock of its own issue without first securing a permit, even though in good faith the issuance of the stock and transfer of title are to take place in a foreign state. (*B. C. Turf & Country Club, Ltd.* v. *Daugherty,* 94 Cal.App.2d 320, 329 [210 P.2d 760].)

Appellant's contention that he could not have conspired with his codefendant Kiers because he did not know him at the inception of the conspiracy is unavailing. The evidence admits of a finding of the existence of a conspiracy between appellant and other persons, which was later joined by Kiers.

It is well settled that one who joins a conspiracy after its formation is liable as a coconspirator just as are those who originated the unlawful agreement (*People* v. *Buffum,* 40 Cal.2d 709, 725 [256 P.2d 317]; *Anderson* v. *Superior Court,* 78 Cal.App.2d 22, 23 [177 P.2d 315]).

Equally unavailing is appellant's contention that sections 25009 and 26104 are unconstitutional as repugnant to the Constitution of the United States in that they contravene article XIV of the amendments to the federal Constitution. The Corporate Securities Act has withstood numerous assaults upon its constitutionality. In answer to appellant's challenge that the act restrains the right of free speech in

violation of the First Amendment to the Constitution of the United States, which is protected by the Fourteenth Amendment against state action, in that it confers plenary and arbitrary powers upon the Commissioner of Corporations, and forbids a person to deal with his property as he chooses, we might quote the following observation of the Supreme Court of the United States relative to the purposes of legislation of this character and of the evils it is designed to correct:

"It will be observed, therefore, that the law is a regulation of business, constrains conduct only to that end, the purpose being to protect the public against the imposition of unsubstantial schemes and the securities based upon them. Whatever prohibition there is, is a means to the same purpose, made necessary, it may be supposed, by the persistence of evil and its insidious forms and the experience of the inadequacy of penalties or other repressive measures. The name that is given to the law indicates the evil at which it is aimed, that is, to use the language of a cited case, 'speculative schemes which have no more basis than so many feet of "blue sky" '; or, as stated by counsel in another case, 'to stop the sale of stock of fly-by-night concerns, visionary oil wells, distant gold mines and other like fraudulent exploitations.' Even if the descriptions be regarded as rhetorical, the existence of evil is indicated, and a belief of its detriment; and we shall not pause to do more than state that the prevention of deception is within the competency of government and that the appreciation of the consequences of it is not open for our review." (*Hall* v. *Geiger-Jones Co.*, 242 U.S. 539, 550 [37 S.Ct. 217, 61 L.Ed. 480, Ann.Cas. 1917C 643, L.R.A. 1917F 514].)

(See also *People* v. *Hoshor*, 92 Cal.App.2d 250, 256, 257 [206 P.2d 882]; *People* v. *Eiseman, supra,* pp. 248, 249 and cases therein cited; *People* v. *Yant*, 26 Cal.App.2d 725, 739, 740 [80 P.2d 506]; *Daugherty* v. *Riley*, 1 Cal.2d 298, 305 [34 P.2d 1005]; *In re Hatch*, 10 Cal.2d 147, 151, 152 [73 P.2d 885]; *Cecil B. DeMille Productions, Inc.* v. *Woolery*, 61 F.2d 45, 49.)

 The answer to appellant's contention that the Corporate Securities Act places an unreasonable burden on interstate commerce is that until the Congress acts, the states are free to impose such an incidental or indirect burden on interstate commerce as may result from the provisions of the Corporate Securities Law which forbids sale or disposition

of corporate securities within the state without a permit (*Caldwell* v. *Sioux Falls Stockyards Co.*, 242 U.S. 559 [37 S.Ct. 224, 61 L.Ed. 493]; *Auslen* v. *Thompson*, 38 Cal.App. 2d 204, 211, 212 [101 P.2d 136]). In conformity with the law as announced in the cases cited it must be held here that the act in question is not unconstitutional.

▮ Appellant's claim that the statute is vague and indefinite and for that reason does not state a public offense is untenable. ▮ The language of the Corporate Securities Law provides an adequate warning as to what conduct comes within its prohibition. (*United States* v. *Petrillo*, 332 U.S. 1 [67 S.Ct. 1538, 91 L.Ed. 1877]; *Drew* v. *Thaw*, 235 U.S. 432 [35 S.Ct. 137, 59 L.Ed. 302]; *People* v. *McCabe*, 60 Cal.App.2d 492, 499 [141 P.2d 54].) ▮ The language conveys a sufficiently definite warning from which any person engaging in the business of issuing or selling securities may ascertain whether his business or enterprise has a sanction of law. Appellant was charged with the crime in terms of the enactment describing the offense and was informed of the action of which he was accused to the extent sufficient to enable him to defend himself. Furthermore, at the trial, appellant was fortified with a copy of the testimony given before the committing magistrate (Pen. Code, § 870).

Appellant's contention that he did not waive his right to trial by jury is not borne out by the record. The clerk's transcript now before us contains the following entry: "Trial by jury is waived by each defendant, personally, his counsel and the district attorney." There was no later request to withdraw the waiver or to demand a jury. ▮ Appellant's contention seemingly is that the waiver must be made before the particular judge to whom the case is assigned for trial. This is not the law. Trial by jury is waived in all criminal cases by consent of both parties, expressed in open court by the defendant and his counsel (Const., art. I, § 7; *People* v. *Colton*, 92 Cal.App.2d 704, 707 [207 P.2d 890]). ▮ And, once a trial by jury has been voluntarily and regularly waived, the waiver cannot thereafter be withdrawn except in the discretion of the court (*People* v. *Cowan*, 38 Cal.App.2d 144, 149 [100 P.2d 1079]). ▮ As pointed out by respondent, "The record in the instant case, which is not challenged, reveals such a waiver in open court. It cannot be contended that another waiver was required when the matter was sent out for trial. The Superior Court is not divided into separate and distinct departments. Juris-

diction is vested by the Constitution in the court, not in a particular judge or department. The Constitution further provides that there may be as many sessions of the court as there are judges. The division into departments is for the convenient dispatch of business. Whether sitting separately or together, the judges hold but one and the same court.

"A transfer from one department to another is not a transfer of the jurisdiction of the cause which remains at all times in the court as a single entity.

"*Thomasian* v. *Superior Court,* 122 Cal.App.2d 322, 331-332 [265 P.2d 165] ;

"*People* v. *Barbera,* 78 Cal.App. 277, 279 [248 P. 304]."

Appellant's contention lacks substance here.

Finally, appellant insists that the judge before whom he was tried had no jurisdiction in the matter because he was elected to the municipal court and was not an appointee of the governor to fill a vacancy then existing in the Superior Court of Los Angeles County. This claim is totally devoid of merit. A similar contention was rejected by the court in *People* v. *Ernst,* 121 Cal.App.2d 287, 297 [263 P.2d 114].

For the foregoing reasons, the judgment is affirmed.

Doran, J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 29, 1956.