[Crim. No. 6148.   Second Dist., Div. One.   Mar. 26, 1959.]

THE PEOPLE, Respondent, v. BEN I. RANKIN et al., Defendants; JAMES H. MORRISON, Appellant.

David H. Caplow for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

LILLIE, J. — Defendant and one Rankin were jointly charged by amended information in Count I, with criminal conspiracy in violation of section 182, subdivisions 1 and 4, Penal Code; in Counts II, III, IV, VI, VIII, IX, X, XII, and XIII, with violations of the Corporate Securities Law (Corp. Code, § 26104, subd. (a)); and in the remaining counts with grand theft, in violation of section 487, subdivision 1, Penal Code. A motion to set aside the information under section 995, Penal Code, having been denied, both defendants pleaded not guilty and personally waived trial by jury as to the counts charging violations of the Corporate Securities Law, which as a group were designated by stipulation as Information A. In addition to the jury waiver, the parties stipulated to the submission of the cause on the transcript of proceedings and the exhibits received on the preliminary hearing, reserving the right to produce additional evidence. At the trial no additional evidence was received, although an agreed statement of facts was filed with the court. Both defendants were found guilty of all the offenses charged in Information A and motions for a new trial were denied. Morrison has appealed from the judgment of conviction and the order denying a new trial; proceedings as to Rankin, who likewise appealed, have abated by reason of his death.

The evidence, necessarily viewed in the light most favorable to the respondent, reveals that defendant's method of operation varied but little in dealing with the several persons, all

residents of Los Angeles County, who invested in defendants' enterprises which consisted of mining claims located outside California. The technique employed is illustrated by the activities hereinafter summarized, involving Dr. Pangman, the prosecution's witness in Count I.

In December of 1954, Morrison made the acquaintance of one Livingston, a securities salesman, who, having indicated an interest in uranium mining, was invited to call at Morrison's office. Livingston met with Morrison the next day. The latter mentioned "a very spectacular uranium deal" in Wyoming that had been brought to him by one Rankin, referred to by him as "the big oil man" who, it appears, Livingston had once met casually. After having been shown a copy of a geological report to Rankin, Livingston said he was interested and in response to Morrison's inquiry stated that he had several clients who also might wish to invest if the report stood up under investigation. After a second or third meeting with Morrison, Livingston subsequently contacted Dr. Pangman, one of his customers, and showed him the report. He told Pangman that Morrison, ostensibly a reputable business man in the community, had advised him of the availability of a group of claims controlled by Rankin in a certain section of Wyoming; that "the ore was right on the ground" and ready for immediate loading and hauling to the buying station 80 miles away. According to Livingston, a 5 per cent interest was obtainable for $2,000, such interest to be reflected by instruments, which would secure clearance from the Corporation Commissioner with whom Rankin had assertedly conferred. At the same time, Livingston explained to Pangman that he himself was investing $1,000 and securing an equal interest for the lesser sum by way of a bonus or commission.

Shortly thereafter Pangman met with Morrison and Livingston; he was told by Morrison that Rankin had a group of claims in the Crooks Gap area of Wyoming and that by arrangement with Rankin they were going to "break out" 20 of these claims which had a commercial grade of uranium that "could be simply scooped up and taken to the buying station." Upon Livingston's recommendation, and after other attractive features of the claims had been described, Pangman indicated his willingness to invest. For $2,000 he was to receive a 5 per cent interest on a limited partnership basis in the group of 20 claims. Pangman testified: "I insisted that this was going to be a limited partnership because

I didn't want to be a general partner in something I didn't know too much about." With that understanding (the papers to be drawn up later), Pangman issued two checks for $1,000 to the order of Rankin and gave them to Livingston.

Subsequently Pangman and Livingston received and signed two instruments captioned "Agreement" and "Agreement of Limited Partnership." By the terms of the first mentioned document, dated January 17, 1955, one Frost (therein referred to as "grantor") undertook to sell to Rankin, Livingston, Pangman, Morrison and Lee Luecke (referred to as "grantees") all of his interest in 20 mining claims therein described for the agreed price of $40,000, payable $12,000 upon the execution of the instrument and the balance payable monthly, but not less than $1,000, in the form of a percentage royalty on all minerals produced. Upon the receipt of the full purchase price, Frost agreed to convey title to the claims (although his ability to do so must be gravely suspect), reserving for himself and his predecessors in interest a 20 per cent overriding royalty. Rankin and the other "grantees" undertook to do all assessment work necessary to keep the claims in full force and effect and to diligently mine the claims in a good and workmanlike manner for not less than 10 days per month unless prevented by forces beyond their control. The second instrument, "Agreement of Limited Partnership," was likewise effective January 17, 1955, and formed a limited partnership under the firm name of Ponderosa Uranium Company to engage in the business of mining, selling and dealing generally in uranium and other minerals on the claims conveyed to the partners by Frost, all of which claims were in turn transferred to the partnership. Rankin and Morrison were declared to be general partners, having a 60 per cent and 25 per cent interest, respectively, in the net profits; Luecke, Livingston and Pangman were listed as limited partners, each with a 5 per cent interest. Article VII of the agreement provided, in part, that the general partners "shall have the sole control and management of the partnership business" whereas "(t)he limited partners shall not take part in the management of the business or transact any business for the partnership," unless and until there be a disagreement between the general partners incapable of settlement.

Shortly after they had financially committed themselves to the first of defendants' enterprises, Livingston and Pangman had another meeting relative to a further investment in Rankin's ventures. Morrison had previously represented to

Livingston that Rankin had a second group of 20 claims known as the Blue Moon Uranium group and would give them a larger interest, 10 per cent, for the same amount of money. At about the same time, another prospective investor, one Holmes, was told by Morrison that he ought to receive a return of $50 a day for five days a week, and possibly $250 a day. Subsequently, Pangman delivered to Livingston two checks for $1,000 each; Livingston issued a check in the sum of $1,000 payable to Rankin. Pangman, Holmes and Livingston later signed and received copies of two documents containing provisions substantially similar to the Ponderosa agreements—the partnership was named Blue Moon Uranium Company; Rankin and Morrison being designated general partners, and Livingston, Pangman and Holmes limited partners with interests of 15 per cent, 10 per cent and 5 per cent, respectively.

The record reveals, and it is not otherwise contended, that during the next six months 10 more companies were organized in much the same manner. In every instance, Rankin and Morrison were designated as general partners (sometimes being joined in that capacity by Livingston), and the investors as limited partners obtained specified percentages of the profits of the business, ranging upward from 2½ per cent for each $1,000. Asked to relate the role he or she expected to play in the partnership, each witness thus concerned testified substantially as did Pangman in that regard. It is undisputed that neither defendant nor any of the partnerships in question sought or secured a permit from the Corporation Commissioner.

Morrison, the sole appellant, contends that (1) the information failed to give him due notice of the offenses charged; (2) sections 26104 and 26104, subdivision (a) of the Corporations Code are unconstitutional in that they are vague, deny appellant the right to obtain and dispose of his property, impose a previous restraint and fail to set up proper standards for the granting of permits; (3) the evidence failed to show either a sale or a security; (4) the court had no jurisdiction over the subject matter of the transactions; (5) the court lacked jurisdiction to try appellant on Counts III, IV, VI and VIII because there was no finding by the magistrate as to probable cause; (6) the judgment is contrary to the law and the evidence; (7) there exists a fatal variance between the proof and the information; and (8) the court improperly denied the motion to dismiss the information (Pen. Code, § 995).

Section 26104 of the Corporations Code declares that "(E)very officer, agent, or employee of any company and every other person, who does any of the following acts is guilty of a public offense punishable by imprisonment . . . or by a fine . . . or by both such fine and imprisonment." There then immediately follows a series of subdivisions, (a) through (g), appellant being charged with violating subdivision (a) which reads: "(K)nowingly authorizes, directs, or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed, or sold, any security, in nonconformity with a permit of the commissioner then in effect authorizing such issue, or contrary to the provisions of this division or of the Constitution of this State." The several counts in Information A accused Rankin and appellant "of the crime of VIOLATION OF CORPORATE SECURITIES LAW, SECTION 26104(a), Corporations Code, a felony, committed as follows: That the said Ben I. Rankin and James H. Morrison on or about (the day, month and year being specified) at and in the County of Los Angeles, State of California, did wilfully, unlawfully, feloniously and knowingly sell and issue, and cause to be sold and issued for value, to-wit (the amount being specified), a security, to-wit, a certificate of interest in a mining title and lease, without first having applied for and secured from the Commissioner of Corporations of the State of California, a permit so to do."

██ Appellant argues that he was charged with violating subdivision (a) only, which commences with the word "Knowingly," is lacking in any declaration that the matter is a public offense, and refers to no person or persons, being assertedly a sentence without a subject. The contention lacks any semblance of substance in light of the cardinal rule of statutory construction that all parts of a statute must be read and considered as a whole so that the enactment may stand in its entirety. In the instant case, the subdivision (a) should be read with direct reference to the preceding (and opening) paragraph which, furthermore, makes use of the conjunctive word "following." ██ Appellant further urges that the information omitted to accord him due notice of the crime purportedly charged in that it failed to allege whether he directed, or aided, in the issue or sale of a security, or whether he issued or sold or assisted in causing a security to be issued, executed, or sold without the necessary permit. The contention is without merit, even if notice were not taken of the amendments liberalizing the rules of pleading in criminal cases (*People* v.

*Pierce,* 14 Cal.2d 639, 645 [96 P.2d 784]). In the first place, all of the acts set out in the pertinent portions of the statute are coupled with the disjunctive "or," one of which, or all of which joined, constitute but one offense (*People* v. *Clemett,* 208 Cal. 142, 145 [280 P. 681] ; *People* v. *Kuder,* 93 Cal.App. 42, 45-46 [269 P. 198, 630]). In the Kuder case, *supra,* the court declared that "not only is it a violation of the Corporate Securities Act to act contrary to its provisions in any one respect, but it is equally illegal and violative of the act to do so in all of them combined. To say that they are distinct offenses is equivalent to the assertion that an indictment charging the issuance of securities contrary to the provisions of a permit, and a failure to comply with the provisions of the act, would embrace two offenses, for each of which a separate sentence might be imposed." Hence, assuming the validity of appellant's argument, he is the gainer thereby as only one penalty can be imposed. Secondly, unlike the situation in *People* v. *Kuder,* 93 Cal.App. 42 [269 P. 198, 630], no demurrer was here interposed. ▮ When a party accused fails to demur upon any of the grounds mentioned in section 1004, Penal Code, the objection is to be deemed waived and cannot be presented for the first time on appeal (*People* v. *Yant,* 26 Cal.App.2d 725, 730 [80 P.2d 506]). ▮ Lastly, section 952, Penal Code, declares that the accusatory count is "sufficient if it contains in substance a statement that the accused has committed *some* public offense therein specified."

▮ As stated in *People* v. *Roberts,* 40 Cal.2d 483, 486 [254 P.2d 501] : "Notice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate," which was done in the instant case. ▮ Appellant's final claim that the information does not charge the offense in the language of the statute in that it substitutes the phrase "without first having applied for and secured . . . a permit so to do" in place of "in nonconformity with a permit," is sheer sophistry. Thus, in *People* v. *Scott,* 74 Cal.App.2d 778, 779 [169 P.2d 967], criticism of the information was found unsubstantial; but it was not there even suggested that the use of similarly substituted language was open to challenge.

▮ Although the Corporate Securities Act "has withstood numerous assaults upon its constitutionality" (*People* v. *Sears,* 138 Cal.App.2d 773, 791 [292 P.2d 663]), appellant's next contention challenges the validity of the legislation upon various grounds, all of which have been previously presented

to reviewing courts, exhaustively argued and decided adversely to appellant's claims. Since it would needlessly prolong this opinion to deal extensively with each specified question, we merely state the ground of attack and the authority dispositive thereof without repetition of the reasoning followed. The legislation is neither vague nor indefinite, and its language provides adequate warning of what is within its prohibitions (*People* v. *Sears, supra,* 793), and hence, not invalid for the asserted failure to set up proper standards (*People* v. *Sears, supra,* 793). Nor does it deny due process (*People* v. *Hoshor,* 92 Cal.App.2d 250, 256 [206 P.2d 882]), or equal protection of the laws (*Agnew* v. *Daugherty,* 189 Cal. 446, 448-449 [209 P. 34]). It does not interfere with the right to acquire, possess and dispose of property as guaranteed by the Fourteenth Amendment to the federal Constitution (*People* v. *Yant,* 26 Cal.App.2d 725, 739-740 [80 P.2d 506]); and does not constitute an unlawful delegation of legislative or judicial power to the commissioner of corporations (*Dominguez Land Corp.* v. *Daugherty,* 196 Cal. 453, 466 [238 P. 697, 44 A.L.R. 1]) or impose an unreasonable burden on interstate commerce, being a valid exercise of the state's police power (*B.C. Turf & Country Club* v. *Daugherty,* 94 Cal.App.2d 320, 329 [210 P.2d 760]). True, the last cited case, as appellant points out, declares that the act "may impose *some* restraint on interstate commerce and places *some* restraint on free speech" (emphasis added), but the court concludes that the legislation is free from attack on those grounds. In short, the Corporate Securities Act "is not unconstitutional in any sense" (*People* v. *Hoshor,* 92 Cal.App.2d 250, 256 [206 P.2d 882]).

Appellant next contends that the interest purchased by the numerous investors did not constitute a "security" within contemplation of the act, and that the transaction in each instance was not a sale as proscribed by the statute. He argues that the trial court erroneously received the two agreements or documents signed by the respective purchasers as one exhibit and considered them together as a security; that private transactions being presumed to be fair and legal, the parties here did not participate in an unlawful enterprise; that the term "securities" in its ordinary meaning does not include deeds or grants to real property, including mining claims; that since the agreements contemplated active participation by the grantees under the agreement of purchase and sale (and the limited partners in the instance of that agreement), no security was involved; and finally, that appellant did not

in fact sell a certificate of interest in a mining claim, as charged, because he himself was a grantee under the purchase agreement and a copurchaser of the mining claims. None of these contentions, for reasons hereinafter appearing, is sustainable.

Section 25008 of the Corporations Code in pertinent part provides: " 'Security' includes all of the following: (a) . . . any certificate of interest in an oil, gas or mining title or lease. . . ."

The principle has long been recognized that in ascertaining whether an instrument is a security within the meaning of the code, the court may look through mere form to substance and consider the facts and circumstances surrounding its execution to determine the true intent of the parties, their mutual purposes and expectations and the potentialities of the rights acquired by the purchaser (*Oil Lease Service* v. *Stephenson*, 162 Cal.App.2d 100, 107-108 [327 P.2d 628].)

Accordingly, whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case (*People* v. *Syde*, 37 Cal.2d 765, 768 [235 P.2d 601]), and a finding that the transaction in question was within the proscription of the statute will not be disturbed if there was substantial evidence to support it (*Stoner* v. *Bisno*, 162 Cal.App.2d 164, 171 [327 P.2d 922]). Applied to interests in a mining title, a sufficient such showing is made when it appears, directly or inferentially, that by the instrument of conveyance the buyer is a mere investor who contemplates the receipt of profits from activities of other persons connected with the enterprise (*People* v. *Rankin*, 160 Cal.App.2d 93, 97 [325 P.2d 10]), as may occur in the case of a limited partnership (*People* v. *Dutton*, 41 Cal.App.2d 866 [107 P.2d 937]). Evidence produced by the prosecution in the case at bar fully justified the trial court following the test discussed in *People* v. *Rankin* and *People* v. *Dutton, supra*, in reaching the conclusion now challenged by appellant. The fact that multiple instruments are required to effectuate the general promotional plan is of no moment (*El Claro Oil & Gas Co.* v. *Daugherty*, 11 Cal.App.2d 274, 281 [53 P.2d 1028, 55 P.2d 488]), for in that event the scheme must be "viewed in its entirety" (*More* v. *Stella*, 52 Cal.App.2d 766, 773-774 [127 P.2d 300]).

Notwithstanding the foregoing principles, appellant asks us to conclude that the trial court erroneously considered the two subject agreements as one document; thus, he asserts

that since neither instrument, taken separately, was a security, they could not be so construed in combination, and that the circumstances of their execution did not warrant their reception in evidence, stapled together, as one exhibit. A similar contention was raised and rejected in *El Claro Oil & Gas Co.* v. *Daugherty*, 11 Cal.App. 274, 281 [53 P.2d 1028, 55 P.2d 488], in which the court pointed out that for the purposes of determining compliance with the Corporate Securities Law, as well as to give force and effect to the fundamental rule governing the interpretation of written instruments, two or more documents, relating to the same matters between the same parties and constituting substantially one transaction, should be taken together. In the present case, the partnership agreement made specific reference to the mining claims listed in the conveyance from their alleged owners; also in every instance the execution of one instrument corresponded closely in time with the execution of the other—only a few days at most intervened.

Likewise unavailing is appellant's assertion that he and the other investors "as tenants in common" under the purchase and sale agreement subsequently transferred the property into a partnership "as an interim step to the formation of a corporation," thus purportedly making the factual situation analogous to that found in *Nicholl* v. *Ipsen*, 130 Cal. App.2d 452 [278 P.2d 927], and *Polizzi* v. *Porcaro*, 110 Cal. App.2d 395 [242 P.2d 949], where the evidence established the existence of a bona fide joint venture based on an expressed intention to incorporate in the future. In the case at bar, there was no such expressed intention, and any efforts to incorporate took place several months after the formation of the various partnerships and then only after the numerous investors grew restless over the failure of the ventures to become productive. Finally, there is no basis for appellant's claim that the trial court was precluded from considering evidence of the partnership agreement because of asserted language in the stipulation which designated the counts triable as Information A. We do not so construe the stipulation; furthermore, an agreed statement of facts was submitted to the trial court and pursuant thereto it was clearly authorized to act as it did.

Similarly without merit is the claim that appellant must have intended to enter into a legal, as distinguished from an illegal, transaction—all private transactions, he argues, are presumed to have been fair and regular. This being a criminal

prosecution, the state is not bound by the written provision of the instruments in question and may establish by parol the real intention of the parties (*People* v. *Sidwell*, 27 Cal.2d 121, 126 [162 P.2d 913]). Also, we do not agree with appellant's premise that the prosecution failed to show that the agreements contemplated a violation of the law. As heretofore pointed out, the mere form of the agreement does not affect or determine its status with relation to the Corporate Securities Law. This conclusion disposes of still another assertion by appellant that the term "security" does not "in its ordinary meaning" cover deeds or grants to real property and the further claim in that connection that a mining claim is real estate. He cites early California decisions which were handed down either long before the initial enactment of the pertinent legislation or prior to the effective date of amendments covering the type of conveyance in suit—none of these cases are in point.

Appellant's remaining claims on this phase of the appeal, while tending to overlap prior contentions, reassert in substance that there was neither a sale nor a security. The difficulty with appellant's argument, as extensively developed, is that he has taken a wholly partisan approach to the evidence adduced in the court below, quoting at length from testimony of prosecution witnesses which assertedly discredits the findings reached by the trier of the fact. ■■ However, "(I)t was the function of the trial court, not this court, to resolve inconsistencies and contradictions . . . and the trier of the fact may believe and accept a portion of the testimony of a witness and disbelieve the remainder. On appeal that portion which supports the judgment must be accepted . . ." (*People* v. *Thomas*, 103 Cal.App.2d 669, 672 [229 P.2d 836]). The representations made by appellant in the course of his transactions with Dr. Pangman have heretofore been recounted, and it is not argued that signatories to subsequent partnership agreements were not similarly persuaded to part with their money. Irrespective of the fact that an offer or an attempt to make a sale comes within the statutory definition of sale (Corp. Code, § 25009; *People* v. *Whelpton*, 99 Cal.App. 2d 828, 831-832 [222 P.2d 935]), due consideration must be given to the circumstance that the interests granted by the agreements in the instant action were small fractional interests in uranium and other minerals to be produced from unproven and undeveloped acreage, located in Utah or Wyoming, and that such interests were sold to residents of California, either

unacquainted or inexperienced in mining operations. It is properly inferrible that such interests are not ordinarily issued to persons who expect to reap a profit from their own services and efforts exerted in the management and operation of such property, but to those in the category of investors who, for a consideration, stipulate for a right to share in the profits or proceeds of a venture to be conducted by others. Likewise inferrible under the circumstances is the fact that provisions in the agreements giving the investors the right of ingress and egress for the purpose of mining the claims were purely formal and manifestly illusory, and appellant's failure to testify emphasizes the weight of such inference (*People* v. *Ashley*, 42 Cal.2d 246, 268 [267 P.2d 271]).

Nor are we in accord with appellant's next proposition which challenges the jurisdiction of the trial court over the subject matter of the present controversy. He argues that the Corporate Securities Law does not attach to transactions consummated, or to be completed, outside the state, pointing out in the instant case that the last signature (usually Rankin's) to one or the other, or both, of the documents in question was affixed either in Colorado, Utah or Wyoming; and that the principal place of business of each partnership business was declared to be Rawlins, Wyoming, where the general partners were to select a bank as the depositary of the company's funds. Accordingly, he concludes, pronouncements found in *Oakley* v. *Rosen*, 76 Cal.App.2d 310, 314 [173 P.2d 55], are determinative of the matter; however, in that case "(C)ertain incontestable facts determined the forum of the agreement" which, as found by the trial court, was a legitimate joint venture wherein it was expressly agreed that the funds invested would not be used until $12,000 had been subscribed and hence the agreement was not complete until the last subscriber had signed it and paid his money in New York. In the case at bar the facts are otherwise. Furthermore, as in *People* v. *Sears*, 124 Cal.App.2d 839, 850 [269 P.2d 683], most of appellant's activities occurred in Los Angeles County where he acquainted prospective investors with the needs of the pending enterprise, attended meetings for the discussion of the interests to be conveyed, and actually made sales and received funds in payment therefor. Also, copies of the agreements evidencing their interest in the venture were delivered to the purchasers in Los Angeles County. These are not the "preliminary" acts which confronted the court in *Oakley* v. *Rosen*, 76 Cal.App.2d 310 [173 P.2d 55]. The

statute prohibits the solicitation or sale of stock or similar interest in a foreign company even where, in good faith, the issuance and transfer of title are to take place in the foreign state (*B. C. Turf & Country Club, Ltd.* v. *Daugherty,* 94 Cal. App.2d 320, 329 [210 P.2d 760]). Clearly, sufficient evidence was thus received establishing venue beyond a reasonable doubt.

The trial court's jurisdiction is further challenged on the ground that the district attorney was without authority to include in the amended information four additional violations of the statute not designated in the order of commitment rendered by the magistrate. He cites the holdings in *People* v. *Bomar,* 73 Cal.App. 372 [238 P. 758], and *People* v. *Nogiri,* 142 Cal. 596 [76 P. 490], which were decided before the amendment of section 809, Penal Code, which has since been incorporated into section 739. The history of the pertinent legislation is extensively discussed in *People* v. *Bird,* 212 Cal. 632, 637-638 [300 P. 23]. By the controlling provisions of section 739, the duty devolves upon the district attorney to file an information "which may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed . . ." The testimony received upon the preliminary examination clearly showed the commission of the offenses against the victims named in all four counts. Additionally, at no time did appellant move in the court below, as authorized by section 995, Penal Code, to have the amended information set aside on the grounds now raised and he is precluded from taking the objection at this stage of the proceedings (Pen. Code, § 996; *People* v. *Ahern,* 113 Cal.App.2d 746, 750 [249 P.2d 63]).

Although submitted without argument or citation of authority appellant's remaining points have been carefully examined. They are mostly repetitious of matters previously discussed and considered and are devoid of merit.

For the reasons herein set forth, the judgment and order appealed from are, and each is, affirmed.

White, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied April 22, 1959, and appellant's petition for a hearing by the Supreme Court was denied May 20, 1959.