[Civ. No. 14013. First Dist., Div. One. Oct. 28, 1949.]

B. C. TURF AND COUNTRY CLUB, LTD. (a Corporation), Appellant, v. EDWIN M. DAUGHERTY, as Commissioner, Respondent.

Morrison, Hohfeld, Foerster, Shuman & Clark, Orville R. Vaughn, Wm. L. Holloway and J. Barton Phelps for Appellant.

Fred N. Howser, Attorney General, T. A. Westphal, Jr., and William M. Bennett, Deputy Attorneys General, for Respondent.

PETERS, P. J.—By writ of mandate filed in the superior court the B. C. Turf and Country Club, Ltd., a corporation organized and existing under the laws of British Columbia, sought to compel the California Corporation Commissioner to rescind an order issued by him on April 24, 1946, directing the Turf Club to cease and refrain from the further sale of its stock in California, and to rescind a letter sent by the commissioner on April 26, 1946, to all California brokers advising them not to trade in the stock of the Turf Club without the commissioner's consent. The trial court denied the requested relief, and from the adverse judgment the Turf Club appeals.

The facts are as follows: George L. Fraser is a barrister practicing law in Vancouver, British Columbia. Prior to 1944, he had represented the owners of two race tracks—Lansdowne Park and Brighouse Park—located in a suburb of Vancouver.

Because of their mutual interest in racing, he had long been friends with Charles S. Howard, junior and senior, Bing Crosby and Pat O'Brien. These persons are all residents of California. Late in 1944, Howard, Jr. visited Vancouver and met Fraser. At that time Howard, Jr. suggested that he and Fraser buy the two tracks, and generally discussed this possibility. Thereafter, Fraser talked to a Mr. Randall, who owned Lansdowne Park and operated Brighouse Park, and ascertained that the tracks were not for sale.

In the spring of 1945, Randall approached Fraser and asked him if he was still interested in buying the two tracks. Fraser promised to get in touch with his principals. He thereupon telephoned Howard, Jr., who was then in California, and ascertained from him that he and his father were still interested in the two tracks. Fraser, thereupon, in his own name, and with $25,000 of his own money, secured an option to purchase Brighouse Park, and a letter indicating the probability that he could purchase Lansdowne Park. Fraser testified that, by this time, he had determined that if the Howards were not interested in the transaction, he and his friends in Vancouver would finance the purchase.

Pursuant to an invitation from Howard, Jr. to come to California to talk over the purchase with him and his father, Fraser arrived in Beverly Hills on September 19, 1945. Before leaving for California he had started to incorporate the Turf Club under British Columbia law, and, in fact, while Fraser was in California, on September 21, 1945, articles of incorporation of the Turf Club were filed authorizing a capital of one million shares, par value of $1.00 per share. Of course, the Turf Club then had no assets, no permit to engage in business, and no plan of financing.

Fraser stayed in California for four or five days. While here, he talked to the two Howards and to Crosby and O'Brien. He testified that he was anxious to interest these men in the deal, because all of them had strings of good race horses, were very influential with other owners and with jockeys, and he was anxious to get good horses and good jockeys to race at the two tracks. He felt that with them as owners of the track, the success of the venture was assured. On one of the days he was in California, Fraser met Howard, Sr., Crosby and O'Brien in Howard's box at Hollywood Park Race Track. Howard, Sr. told Fraser that he did not think it wise for him and his friends to purchase the two Vancouver tracks;

that it was advisable that Vancouver people should be financially interested; that otherwise there would be antipathy to out of state control. He clearly indicated, however, that he would be interested in coming in with others on the deal. In a subsequent conversation with O'Brien, O'Brien told him that he might be "interested in the undertaking to the extent of $25,000.00." Crosby told Fraser that he might be interested "to the extent of Mr. Howard," and told Fraser that, on the assumption a corporation would be formed, he would be glad to serve on the board of directors. Fraser testified that when he left California he had determined to go ahead with the deal whether or not his California friends came in, and that when he left California he did not know whether any of the California residents involved would buy stock in the company. At that time he was not sure whether the deal could be financed, and he was by no means certain he could buy Lansdowne Park. That, substantially, is a summary of what occurred in California at that time.

Fraser returned to Vancouver and discovered that, while he could get an option on Lansdowne Park, Randall had raised the proposed purchase price, and also insisted that any sale of the track would also have to include the sale of an office building in Vancouver owned by Randall. Fraser, in his own name, and with his own money, on October 1, 1945, secured an option to buy Lansdowne Park.

By this time Fraser had determined to proceed with the organization of the Turf Club, and to finance the project by the sale of stock. During October, and up to November 24, 1945, Fraser had conversations with several Californians, who were his friends, concerning the enterprise. These conversations all took place in Vancouver. As a result of these activities, about 26 Californians subscribed to about 121,100 shares out of the 750,000 shares of the initial stock issue.

Howard, Jr. visited Vancouver shortly after the 1st of October to further discuss the proposition, and to accompany Fraser on a hunting trip. At this time, although the articles of incorporation of the Turf Club had been filed, the company had no certificate to do business, had not filed a prospectus, and had no fixed plan of financing. Fraser decided to ask permission of the British Columbia authorities to sell 750,000 shares as the initial stock issue. He entered into an agreement with five Vancouver brokerage firms to underwrite the issue, it being agreed that the shares should sell for $1.00 per share, the brokers to receive 10 cents per share commission, but it

being also agreed that on the shares sold to the Canadian promoters, and to the California residents, but 90 cents should be charged, the brokers receiving no commission on these sales. The brokers were certain that they could sell the entire issue in Vancouver, and were by no means anxious to sell to California residents, because on such sales no commission would be earned. Fraser was not sure that the entire issue could be sold, and he wanted to protect Howard et al., in the event the financing plan fell through. To settle these conflicting interests, the brokers, Howard, Jr. and Fraser held several conferences in Vancouver. Out of these conferences developed the plan that was used by most of the California subscribers. Fraser prepared a form to be deposited with the Dominion Bank in Vancouver, together with the subscriber's check. By this form agreement the subscriber deposited his money with the bank, and the bank was instructed to hold the subscriber's money until $750,000, including the California subscriptions, had been subscribed. When this amount had been raised and it was thus assured that the capital needed had been raised, the Dominion Bank was instructed to buy the stock for the California group. If the total amount was not subscribed, the bank was directed to return the money deposited by the California subscribers.

Some of the California group received these forms from Fraser or the Dominion Bank while they were visiting in Vancouver. Howard, Jr., when he left Vancouver, took some of these forms with him to California, and he turned them over to his father and a few of their friends. A Mr. John Meyer, business representative and associate of Howard Hughes, visited Fraser in Vancouver, and asked to be let in on the deal. He received some of the forms from the Dominion Bank and brought them back to California, where they were distributed by Meyer to the Hugheses and some of their associates. A Mr. Gilmore, a client of Fraser's, telephoned Fraser from San Francisco and asked about the deal, and was told by Fraser about the procedure to be followed.

The brokers were very successful in selling the balance of the stock, and the issue was oversubscribed the day the stock was offered for sale. About 550,000 shares were sold to British Columbia residents at $1.00 per share, and about 200,000 shares were sold to California residents or directors of the company at 90 cents per share. Fraser purchased 55,000 shares.

When the issue was oversubscribed, the Dominion Bank, pursuant to instructions, purchased the stock in the names of the California residents who had deposited money with it, received the shares, and sent them on to the owners in California.

The investment has been a sound and profitable one, and no shareholder has ever complained. No subscriptions were ever taken in California, and every share sold was sold in British Columbia. Some of the California purchasers have, however, resold their stock in California. Fraser testified, and the evidence shows, that he acted in good faith and without the slightest intent to evade the California law.

In the early spring of 1946, during some negotiations with the Securities and Exchange Commission, Fraser heard that there was a possibility that the corporation had violated the California Corporate Securities Act. He immediately wrote to the California Commissioner of Corporations and made a full disclosure of all that had been done, and stated that he had no intent of violating California law and was perfectly willing to comply with all California regulations. An exchange of correspondence led the California authorities to the belief that a violation of California law had occurred. On April 24, 1946, the commissioner issued a cease and refrain order directing the Turf Club "not to sell or offer for sale, negotiate for the sale of, or deal in any of the capital stock or other securities" of the Turf Club "for the reason that, in the opinion of the Commissioner . . . the sale thereof is and would be unfair, unjust and inequitable to the purchaser thereof." Two days later the commissioner sent a letter to all California brokers notifying them of the issuance of the cease and refrain order, and informing them that "no transactions in shares of this company should be had until first obtaining a clearance from the Commissioner of Corporations."

The Turf Club requested a hearing before the commissioner, and such a hearing was had in April of 1947. Appellant claims that the hearing was on the cease and refrain order and on the letter to the brokers, while the respondent claims that the hearing was on the order alone. Although the request for a hearing refers only to the cease and refrain order, appellant, at the hearing, requested that the broker's letter also be considered, and it would appear that the letter was considered at the hearing, although the discussion is ambiguous and no definite ruling was made. It is obvious, however, that the letter was the main object of appellant's attack. The cease and refrain order did no direct harm to the corporation, be-

cause it had no legal right to sell its stock in California without a permit. The cease and refrain order, therefore, prohibited nothing more than what the law itself prohibits. Such order, however, if not based upon a violation of the act, indirectly did the company immeasurable harm throughout United States and Canada, because it publicly implied that the company was a violator of the California law. The letter to the brokers, however, directly affected the company and its stockholders. It means that no California stockholder, who admittedly owns lawfully issued stock, can sell his stock in California through a broker without first securing permission of the commissioner. The letter was directly predicated upon the prior order. This being so, any attack on the order is necessarily an attack on the letter. If the order falls, the letter, being based on the order, falls with it.

The commissioner found "That B. C. Turf and Country Club Limited, through its agent George Lovat Fraser, solicited subscriptions for stock of B. C. Turf and Country Club Limited in California and from California residents without first, or ever, having applied for or obtained a permit from the Commissioner of Corporations of the State of California authorizing said B. C. Turf and Country Club Limited so to do."

He also reached the conclusion ". . . that B. C. Turf and Country Club Limited violated the Corporate Securities Act of the State of California, and took subscriptions and issued shares in violation thereof, and that the par value of said shares of only $1.00 per share violated subdivision (b) of Section 663 of Article 25 of Title 10 of the California Administrative Code, which provided as follows:

"663. The race track company shall covenant on behalf of itself, its successors or its assigns with the Corporation Commissioner for the benefit of its security holders, as a condition precedent to obtaining a permit to issue securities, and prior to said Corporation Commissioner granting or denying said permit, that: . . .

"(b) The nominal or par value of each security sold and issued shall be $1,000 or full multiples thereof, except as provided in (c) following:

"(c) The Company shall issue securities of more than one class only when the Commissioner has determined an emergency makes such issuance necessary; . . ."

Based on these conclusions, the commissioner directed that the cease and refrain order remain in full force and effect.

Pursuant to section 1094.5 of the Code of Civil Procedure, the appellant applied to the superior court for a writ of mandate directing the commissioner to set aside both the order and the stop letter. The commissioner moved to strike those portions of the petition referring to the stop letter, but this motion was denied. The case was tried by the lower court on the transcript and exhibits introduced before the commissioner. The trial court, exercising an independent judgment on the facts, denied the petition. The trial court found that Fraser solicited California residents to purchase stock in the company during his California visit without a permit required by law; that all that was before the commissioner and the court was the cease and refrain order; that the corporation also violated the California law in issuing shares with a $1.00 par value in violation of section 663 of article 25 of title 10 of the California Administrative Code; that a further sale of appellant's stock in California would be unjust and inequitable to the purchasers. Based on these findings, judgment was entered in favor of the commissioner. From this judgment the Turf Club appeals.

Before directly discussing the contentions of appellant, there is one matter that should be mentioned. The shares of the Turf Club were issued, and title passed, to the California subscribers in British Columbia. The contract of purchase was executed there. There was no bad faith. Therefore, even though the negotiations had in California violated the California statute, a point later to be discussed, the securities issued and delivered in the foreign state to California stockholders are valid securities. (*Robbins* v. *Pacific Eastern Corp.*, 8 Cal.2d 241 [65 P.2d 42]; *Jones* v. *Re-Mine Oil Co.*, 47 Cal.App.2d 832 [119 P.2d 219].) The commissioner concedes that this is the law.

Although the parties discuss many points in their briefs, there is one question that is of primary and decisive importance, and that is whether the acts of Fraser constituted a solicitation of a sale in violation of the California statute.

The Corporate Securities Act (Stats. 1917, p. 673, as amended; 2 Deering's Gen. Laws, Act 3814) clearly applies to foreign corporations. Section 2(a), subdivision 3, expressly so provides. The term "sale" as used in the act has a much broader meaning than that term normally has. Section 2(a), subdivision 8, defines "sale" as including "an attempt to sell,

an option of sale, a solicitation of a sale, subscription or an offer to sell, directly or by an agent, or a circular letter, advertisement, or otherwise.'' Section 3 of the act provides in part: ''No company shall sell any security . . . or offer for sale, negotiate for the sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do.'' The balance of the section sets forth what the application for such a permit must set forth, requiring the applicant to give a full and complete disclosure of the entire plan of operation of the company, a full disclosure of its financial set up, and other matters.

 From a standpoint of interpretation, there can be no reasonable doubt but that these provisions of the statute require a foreign corporation to secure a permit to solicit a sale of its stock in this state, or to engage in preliminary negotiations looking towards such sale, even though the issuance of the securities and the transfer of their title will, in good faith, be completed in a foreign state. The sections quoted clearly prohibit a foreign corporation from soliciting in this state a sale of stock of its own issue without first securing a permit, even though in good faith the issuance of the stock and transfer of title are to take place in the foreign state. We also have no doubt that, although such a regulation may impose some restraint on interstate commerce and place some restriction on free speech, it is a valid exercise of the state's police power, and is not unconstitutional. It is true that in the Robbins case, *supra,* these problems were expressly left open and not decided, and that no other California case seems to have expressly determined these questions, but the suggested construction is so clear that reasonable minds cannot differ thereon, and the question of constitutionality has been so long settled that citation of authority would be superfluous.

 The determination that the statute constitutionally requires a foreign issuer to secure a permit before soliciting sales of stock in this state, even though there is no fraud, exploitation, sham or intent to evade, and even though the issuance of the securities and transfer of their title will take place in the foreign state, does not settle the problem presented in the instant case. There still remains the question as to what type of solicitation and what type of preliminary negotiations fall within the intent of the statute. In one sense, any talk that ultimately leads a prospect to invest in the enterprise is solicitation. But it is quite obvious that the term was not used

in that sense in the statute. If the statute purported to pro-hibit all talk about organizing a corporation without first se-curing a permit, it is quite likely that the statute, so construed, would be unreasonable and unconstitutional. No corporation is ever organized unless there is some preliminary discussion among the promoters and prospective investors about the proposed company. The statute—section 3—requires the ap-plicant for a permit to set forth, among other things, the names and addresses of the officers of the company, the location of its principal office, an itemized account of its financial condition, a detailed statement of its proposed plan of operation, a copy of its proposed securities, a copy of any contract proposed in relation to its securities, a copy of its prospectus, a copy of its articles, the date it proposes to sell its securities, the number, kind and amount of securities it proposes to sell, the par or face value, if any, and the price of its securities; the commis-sion to be paid on the sale of its securities; if a foreign corpo-ration, a copy of the certificate authorizing it to do business in the foreign state, and other matters. It is quite clear that during the preliminary phases of organization, during the period the promoters are trying to decide whether to organize, how to organize, and whether there is any prospect of finan-cial assistance from possible investors, there must be some talk among those interested before the above information could be presented to the corporation commissioner. No one has ever suggested that if a foreign promoter, or even a local promoter, asked the commissioner for a permit to talk to local persons about the possibility of forming a corporation, that such a permit would or could be granted. There is no ma-chinery set up by the act for the issuance of such a permit. When it is remembered that a violation of the act constitutes a criminal offense, if the statute were ever interpreted so as to prevent such preliminary talk, every promoter of every corporation ever organized in this state would be a criminal violator. While regulation is necessary in this field, and hon-est, legitimate business must, under the police power, submit to reasonable controls in order to effectuate the purpose of the statute, the controls, by strained construction, should not be extended to wholly unnecessary, unreasonable or absurd lengths. The courts must approach this problem with some degree of realism. If all preliminary talk in this state about organizing or financing or reorganizing a proposed foreign corporation requires a permit, then no such ''talk'' can ever lawfully take place in this state, because no permit can be

secured to permit such talk. If the foreign promoter cannot talk about organization or proposed plan of financing to California residents without first securing a permit, and if a plan of organization and financing cannot be worked out until it is talked about, and if a permit cannot be secured until the plan of organization and financing is fully disclosed to the commissioner, then we have reached a complete impasse. The statute should not be so construed. If it is apparent or reasonably inferable that there is fraud or exploitation present, or that the so-called preliminary negotiations are a sham, or that there is an intent to evade the California statute, there can be no doubt that the commissioner has the power to interfere and that the statute is applicable. But where, as here, these elements are not present, it is clear that the statute does not and constitutionally could not prohibit an exchange of views or a general discussion of a plan of organization. A business conversation preliminary to any fixed plan is not prohibited.

Now how do these rules apply to the present case? There is no fraud or exploitation here present. The form of the transaction was not a sham, and there was no intent to evade our statute. The discussions had by Fraser in California with the Howards, Crosby and O'Brien did not amount to solicitation. Fraser came to California to see if these persons desired to buy the two tracks. He required no permit, under any theory, to discuss that problem. When Howard indicated the reasons why he was not interested in the complete ownership, Fraser, at most, discussed the possibility of these people becoming financially interested. At that time, although the articles of incorporation had been filed, Fraser had no stock to sell. The foreign corporation had no permit to engage in business. It had no permit to sell stock, and at that time had no assets. No plan of operation then existed. The Brighouse option was in Fraser's name, and he was by no means certain he could purchase Lansdowne. His primary purpose in coming to California was not to secure financing. It was to secure the aid of the Howards, Crosby and O'Brien in supplying the two Vancouver tracks with a high quality of horses, good jockeys and the benefit of their experience in horse racing. He wanted them for directors, if he could get them, but before he could get them to act in that capacity, he had to ask them to serve. Fraser was not, during his visit to California, soliciting the sale of shares in the corporation. As already

pointed out, when Fraser came to California the enterprise was in a most nebulous state of formation. The only thing he had to sell was the personally owned option on Brighouse Park and the general idea of operating race tracks in Vancouver. With or without the financial help of the people he interviewed, he intended to proceed with the project and operate the track or tracks. The actual plan of operation was not worked out until Fraser returned to Vancouver. Then, with Howard, Jr. in Vancouver, a plan was worked out whereby the California purchasers made the Dominion Bank their agent and deposited their money with that bank. Until the last part of November, 1945, when the brokers had sold the full 750,000 shares, including those purchased by the Californians, any of the Californians could have withdrawn their money from the bank. The great majority of the shares sold to Californians was sold as a result of conversations had by Fraser with the prospective purchasers in Vancouver, or as a result of a Californian talking to Fraser in Vancouver, and then voluntarily, and without solicitation by Fraser, returning to California and interesting his friends in the deal.

It is quite apparent that, under the rules already set forth, the discussions had in California by Fraser during his short visit in September, did not amount to solicitation or the type of preliminary negotiation requiring a permit under California law.

The commissioner next argues that Howard, Jr. and John Meyer, who visited Fraser in Vancouver and talked the deal over with him there, when they secured from the Dominion Bank the forms for California subscribers and returned with them to California and distributed them among their friends, were not acting on their own account, but were acting as agents of the corporation. Their acts, according to the commissioner, as such agents, in California, amounted to solicitation within the meaning of the statute. Of course, if in fact Howard, Jr. and Meyer were agents of the corporation, their acts in California in distributing the forms, would have amounted to unlawful solicitation. In such event, both Howard, Jr. and Meyer would be subject to the criminal provisions of the act, and the corporation would be subject to the cease and refrain order. But the difficulty with this theory is that there is a total lack of any evidence of agency. The evidence on this issue is subject to but one reasonable inference, and that is, that Howard, Jr. and Meyer were acting on their own behalf and not on behalf of the corporation.

The corporation at that time had no need of further California money. The brokers were confident that they could sell the full issue in Vancouver and did not want to sell shares to California residents, because they made no commission on California sales. The entire issue was oversubscribed the first day of the sale. The evidence quite clearly demonstrates that Howard, Jr. and Meyer were acting on their own initiative in taking some of the forms back to California for the use of their friends and associates. There is no basis at all for the argument based on agency.

The holding already made disposes of the major issues on this appeal. It likewise disposes of the arguments about the letter to the brokers. While the superior court found that the hearing before the commissioner did not include a hearing on the letter, it is quite clear that the letter was considered by both the commissioner and the court. The letter was introduced before the commissioner and was the subject of Finding VII of the trial court, the court finding the letter was sent to all California brokers and that the sending of it was not an abuse of the commissioner's discretion. This finding was obviously based on the finding that there was an unauthorized sale without permit in California, and falls with that finding. It is too apparent to require extended comment that the letter was predicated on the cease and refrain order and falls with it.

This conclusion also disposes of the contention that the sale of race track stock with a par value of $1.00 violated the rule adopted by the commissioner that race track shares must have a par value of $1,000. Even if this rule, and the subsequently adopted statute, applied to a foreign issuer who sells his stock in this state (a point strongly opposed by appellant), they could only apply when such foreign issuer "sells" his stock within this state within the broad meaning of the term as used in the statute. If no "sale" took place in this state, giving the rule and the subsequently adopted statute their broadest application, they could not apply to the stock here involved, because no "sale" took place in this state.

The judgment appealed from is reversed.

Ward, J., and Bray, J., concurred.

A petition for a rehearing was denied November 26, 1949, and respondents' petition for a hearing by the Supreme Court was denied December 22, 1949. Shenk, J., voted for a hearing. Gibson, C. J., did not participate.