[Civ. No. 6426.   Fourth Dist.   Aug. 29, 1960.]

MALCOMB B. COUTTS et al., Appellants, v. JAMES A. GRANT et al., Respondents.

Sullivan, Sullivan & Fox for Appellants.

Schall, Nielsen & Boudreau and Harold D. Cornell for Respondents.

COUGHLIN, J.—The plaintiffs invested $11,700 in the purchase of shares of stock of Bonanza Oil Corporation as a result of a transaction in which the defendants participated. The sale took place in California. Bonanza Oil Corporation was a Nevada corporation which had not obtained a permit to sell its stock in the State of California. By their complaint the plaintiffs, in one count, allege that the defendants bought this stock for them as their agents, paying 10 cents a share therefor and charging them $1.00 per share; and in a second count, allege that the defendants sold this stock to them in violation of the Corporate Securities Law. (Corp. Code, tit. 4, div. 1.) Plaintiffs seek recovery of the $11,700. After a trial, the court found that the defendants were not agents of the plaintiffs and that the sale was not in violation of the Corporate Securities Law. Judgment was entered accordingly from which the plaintiffs appeal, admitting the sufficiency of the evidence to sustain the finding that the defendants were not their agents, but contending that the evidence establishes as a matter of law that the sale in question was in violation of the Corporate Securities Law.

Unless the evidence admits of but the single conclusion that the sale under consideration constituted a violation of the Corporate Securities Law, the question presented is not one of law but of fact, upon which the determination of the trial court is conclusive. (*Bowman* v. *Collins*, 181 Cal.App.2d 807, 810 [5 Cal.Rptr. 776]; *Clapp* v. *Hester*, 169 Cal.App.2d 558, 560 [337 P.2d 525]; *Ray* v. *Hanisch*, 147 Cal.App.2d 742, 750 [306 P.2d 30]; *Benjamin* v. *Rutherford*, 146 Cal.App.2d 561, 562 [303 P.2d 1079]; *Winn* v. *Ferguson*, 132 Cal.App.2d 539, 543 [282 P.2d 515].) To establish a fact as a matter of law the state of the record must be such that any finding to the contrary would be reversed on appeal because of the insufficiency of the evidence to sustain such finding. (*McBride* v. *Atchison, Topeka & S. F. Ry. Co.*, 44 Cal.2d 113, 116 [279

P.2d 966] ; *Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768] ;
*Rowe* v. *Edwards,* 152 Cal.App.2d 648, 653 [313 P.2d 82].)
Conflicts in the evidence, conflicting interpretations
thereof and conflicting inferences which reasonably may be
drawn therefrom present issues of fact for determination by
the trier of fact, who ''is the sole judge of the credibility of the
witnesses''; may ''disbelieve them even though they are un-
contradicted if there is any rational ground for doing so'';
and, in the exercise of a sound legal discretion, may draw or
may refuse to draw inferences reasonably deducible from the
evidence. (*Blank* v. *Coffin,* 20 Cal.2d 457, 461 [126 P.2d 868] ;
*Gray* v. *Southern Pacific Co.,* 23 Cal.2d 632, 640 [145 P.2d
561] ; *Juchert* v. *California Water Service Co.,* 16 Cal.2d 500,
508 [106 P.2d 886] ; *Garland* v. *Hirsh,* 74 Cal.App.2d 629, 636
[169 P.2d 405].) The record before us must be considered
in the light of these time-honored rules. (*Martinez* v. *Southern
Pacific Co.,* 45 Cal.2d 244, 248 [288 P.2d 868].)

The plaintiffs Coutts and Engelhorn and the defendant
Grant are licensed medical doctors. The defendant Martin is
a licensed dentist.

In March or April of 1958, Coutts and Grant, while in the
doctors' lounge at Quintard Hospital awaiting the preparation
of surgical facilities, engaged in a general conversation which
included a discussion of their investments. Grant mentioned
that he had purchased some Bonanza Oil Corporation stock;
that it looked interesting; and explained what he knew about
the situation. In the preceding January, Grant had purchased
17,500 shares of this stock from an individual named Fisher
for $1,750. Coutts inquired as to whether there was any stock
available; Grant replied that he did not know; and Coutts
asked that Grant call him if some stock did become available.

About this time, Grant, through a patient by the name of
Goodman, met the defendant Martin. Both Goodman and
Grant were interested in the activities of the Bonanza Oil
Corporation; participated in obtaining oil leases in Wyoming;
and entered into a trade agreement with Martin, who was
acting on behalf of an association known as the Romar Land
and Development Company, Inc., which entitled them to an
additional 215,000 shares of stock in Bonanza Oil Corporation
upon the transfer of these oil leases and the payment of $6,550.

The incorporation of Romar Land and Development Com-
pany, Inc., a Nevada corporation, hereinafter referred to as
''Romar,'' commenced in February of 1958, but actually was
not completed until June 18 of that year, although the parties

interested had started to function as a corporation on June 1st. It was a two-family corporation consisting of Martin and his wife, and a man named Rose and his wife. Between them they owned 85,000 shares of "Bonanza" which they agreed to transfer to the corporation. This agreement was performed by a transfer on June 14, 1958. In the meantime, Bonanza Oil Corporation had given "Romar" an oral option to purchase its stock at 10 cents per share until a Securities Exchange Commission clearance was issued and "if the well came in" the "option would be null and void."

On the morning of June 7, 1958, Grant received a telephone call from Goodman stating that the latter had received word from Las Vegas that oil sands had been struck in the "Bonanza" drilling site, and it looked like they were going to get an oil well. That night Martin told Grant, at a party to which he had been invited by a mutual friend, that he would like to get back some of his original investment in "Bonanza" and would sell some stock for $1.00 per share; that he believed the stock now was worth $1.00 per share because of the recent developments. Grant knew that Martin owned the 85,000 shares previously referred to, but did not know of the option from "Bonanza" to "Romar." The next day, June 8, Grant called Coutts, told him of the news from Las Vegas; that it looked like the investment was a pretty good thing but that it was a gamble, and suggested that Coutts should not invest over $1,000; that Dr. Martin had some private stock which he was offering for sale at $1.00 per share; that this stock originally had been purchased for 10 cents per share but Martin felt it was a sure proposition now and wanted more money for his stock; and that he, Grant, intended to buy a little more stock. As heretofore noted, Grant and Goodman had an option to purchase additional stock from "Romar." In reply to an inquiry from Coutts, Grant told how he became interested in this investment through a patient named Goodman. Coutts said that he had known Goodman for three or four years; indicated his intention to inquire of Goodman about the matter; and thereupon called Goodman and received assurances that made him feel more confident in going ahead with an investment.

Coutts testified that during the course of his telephone conversation with Grant, the latter also told him that it was necessary to purchase the stock through Dr. Martin because the Nevada corporation issuing it could not sell stock in California; that Dr. Martin had formed a corporation in Nevada

to which the stock legally could be sold and subsequently transferred to residents of California.

During the afternoon and evening of the same day, *i.e.,* June 8, Coutts called Grant several times; stated that he had talked with Goodman; and inquired as to the amount of stock which could be obtained. In reply Grant told him that Martin had a little stock for sale but did not know how much.

The next morning Mrs. Coutts came to Grant's office; presented him with two checks, one in the sum of $6,500 to cover Coutts' investment, and the other in the sum of $5,200 to cover Engelhorn's investment; and apologized for bringing Engelhorn into the deal. This was the first time that Grant knew about Engelhorn or how much Coutts wanted to invest. The checks were made payable to Martin; were delivered to him by Grant and were deposited in Martin's personal bank account. Thereafter on the same day, *i.e.,* June 9, Grant and Martin flew to Las Vegas in a rented plane; Grant went along so that he could do some flying, to get in some flight time, as the pilot was his flying instructor. Previously Grant and Goodman had exercised their option to purchase additional shares of "Bonanza" stock from "Romar," and as part of the purchase price Grant paid Martin $6,550. Martin indicated a desire to obtain additional funds and Grant decided to invest another $500 for the purchase of an additional 500 shares from Martin at $1.00 per share. In the meantime, Martin had heard from an official of "Bonanza" who told him that the Securities Exchange Commission was expected to make a clearance within "several weeks" and suggested that if he had any personal stock to sell, he "would be a darn fool, to let it go for less than a buck." It is apparent that Martin was attempting to raise as much cash as possible to make a purchase of "Bonanza" stock at 10 cents a share before his option expired. However, he did not tell Grant of his plans. Upon arrival at Las Vegas, Martin, Grant and the pilot went to the office of the Bonanza Oil Corporation. While Grant and the pilot went out to eat and upon their return waited in the reception room, Martin, as president of "Romar," was conducting his business with officials of the Bonanza Oil Corporation in a private office; advised those officials that, on behalf of "Romar," he desired to exercise its option and purchase 268,000 shares of "Bonanza" stock; paid $26,800 from his personal bank account therefor; requested that these shares be evidenced by several certificates, including three separate ones respectively for the number of shares purchased by Coutts,

Engelhorn and a Dr. Cole; on the same day, on behalf of ''Romar,'' executed assignments of the three certificates to the three purchasers but left them in Nevada until the corporate seal of ''Romar'' could be attached thereto, which occurred some time later; and thereafter delivered the certificates to the purchasers in California. No United States Internal Revenue stamps were placed on the certificates in connection with any of these transfers, and no income tax returns were made with respect to any of these sales.

Pertinent sections of the Corporate Securities Law relied upon by the plaintiffs provide, that no company shall sell any security of its own issue without first obtaining a permit to do so from the Commissioner of Corporations (Corp. Code, § 25500); that every such security sold or issued by any company without a permit is void (Corp. Code, § 26100); and that every person who knowingly authorizes, directs or aids in the issue or sale of any security contrary to the provisions of the Corporate Securities Law is guilty of a public offense. (Corp. Code, § 26104.) These provisions apply to and prohibit a foreign corporation from selling shares of stock of its own issue in California, either directly or indirectly, without first obtaining a permit from the Corporations Commissioner. (*People* v. *Mills,* 162 Cal.App.2d 840 [328 P.2d 1049]; *B. C. Turf & Country Club* v. *Daugherty,* 94 Cal.App.2d 320, 329 [210 P.2d 760]; *People* v. *Allen,* 47 Cal.App2d 735, 745 [118 P.2d 927]; *Auslen* v. *Thompson,* 38 Cal.App.2d 204, 210 [101 P.2d 136].) If the evidence in this matter, under the rules on appeal heretofore set forth, bring the facts of this case within the foregoing provisions of the law, the judgment of the trial court should be reversed. On the other hand, section 25152 of the Corporations Code provides that:

''. . . the Corporate Securities Law does not apply to the sale of securities when (a) made by or on behalf of a vendor not the issuer or underwriter thereof who, being a bona fide owner of the securities, disposes of his own property for his own account, and (b) the sale is not made, directly or indirectly, for the benefit of the issuer or an underwriter of the security, or for the direct or indirect promotion of any scheme or enterprise with the intent of violating or evading any provision of the Corporate Securities Law.''

If the evidence in the record is susceptible of interpretation or inference which brings the facts of this case within the foregoing exception, then the decision of the trial court must be affirmed. (*People* v. *Davenport,* 13 Cal.2d 681 [91 P.2d

892] ; *Richards* v. *Oliver*, 162 Cal.App.2d 548, 562 [328 P.2d 544] ; *People* v. *Lesser*, 123 Cal.App. 489, 493 [11 P.2d 668].)

■ "When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Primm* v. *Primm*, 46 Cal.2d 690, 694 [299 P.2d 231] ; *Estate of Schultz*, 54 Cal.2d 513, 516 [6 Cal.Rptr. 281, 353 P.2d 921].)

■ Our review of the record leads to the unequivocal conclusion that the issue presented by the evidence in this case is one of fact and not of law, the determination of which was the sole province of the trial court. (*People* v. *Murphy*, 17 Cal.App.2d 575, 583 [62 P.2d 592].) The record adequately supports the conclusion that the shares of stock sold by the defendant Martin to the plaintiffs were issued to "Romar" in Nevada in the course of a bona fide sale; that they were the shares of stock of "Romar" and not of "Bonanza"; that in selling such stock, Martin was acting on behalf of "Romar" and not on behalf of "Bonanza"; and that, as a consequence of the law in the premises, the sale in California without a permit was valid.

In their opening brief, the plaintiffs claimed that "Romar" was a nonexistent corporation. The defendants replied with the contention that "Romar," at least, had a de facto existence. The evidence and the law would sustain a finding to such effect. (*Baar* v. *Smith*, 201 Cal. 87 [255 P. 827] ; *Westlake Park Inv. Co.* v. *Jordan*, 198 Cal. 609, 613 [246 P. 807].) However, the necessity therefor is obviated as plaintiffs countered with the concession that the status of this corporation is of no ultimate consequence since it was used as an instrumentality to sell "Bonanza" stock, and the participation by defendants in that sale rendered them liable. The evidence respecting the corporate organization, operation and existence of "Romar" would have supported an inference adverse to the defendants' contention that the sale of "Bonanza" stock to it was bona fide. (*People* v. *Davenport*, 13 Cal.2d 681, 684-685 [91 P.2d 892].) However, the trial court was not required to and did not draw such adverse inference. Its finding that the sale to plaintiffs was not from Bonanza Oil Corporation disposes of the contentions made by them.

The judgment is affirmed.

Griffin, P. J., and Shepard, J., concurred.