Andrew A. SANDOR and Alfred Holiday, Plaintiffs,

v.

RUFFER, BALLAN & CO., Inc., Charles Ruffer and Eli Ballan, Defendants.

No. 66 Civ. 388.

United States District Court
S. D. New York.

Jan. 19, 1970.

DiFalco, Field, Florea & O'Rourke, New York City, for plaintiffs, by Walter M. Schwartz, New York City, of counsel.

Joseph J. Nesis, New York City, for defendants.

## FINDINGS AND OPINION

POLLACK, District Judge.

Plaintiffs, two California residents, in October, 1961, each purchased five shares of Class B non-voting stock in a New York, over-the-counter stock broker-dealer corporation, the defendant, Ruffer, Ballan & Co., Inc. Each plaintiff paid $12,500 for five shares. Approximately five years after these purchases, in 1966, the plaintiffs brought this suit for rescission and the recovery of the money paid for the stock alleging that they were fraudulently induced to make this investment in 1961; that they were fraudulently induced to consent to recapitalization of the corporation and sign corporate documents to effect an amendment to the charter of the corporation in 1962; that they were refused delivery of their stock certificates; that no permit for the 1961 or 1962 transactions was obtained from the California Securities Commission although required by California law; and that the sale to the plaintiffs was made in violation of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10(b) 5 of the General Rules and Regulations issued thereunder.

The plaintiffs came in contact with the defendants through one, Larry Smith, who was at the time, the manager of the Beverly Hills, California branch of Hemphill, Noyes & Co., members of the New York Stock Exchange. Plaintiff Alfred Holiday is a brother-in-law of Larry Smith and bases his claims of fraud on statements made to Smith.

The plaintiff, Andrew A. Sandor is a physician. He was very active as a speculator in the stock market and had established connections in New York with a network of 15 to 20 brokerage houses. He was a sophisticated investor before and since the transactions herein involved. From 1963 until mid-1967 he was a financial advisor registered with the Securities and Exchange Commission. He was recently written up very extensively in a national publication as one with uncanny ability to trade and his specialties are described as: "otolaryngology and hot new issues"; "Dr. Andrew A. Sandor looks for new issues that promise quick gains." His mode of operation was to jump in and out of new issues very quickly. "Some of his trusted brokers, in fact, have his standing order to put him in a new issue and take him out of it the same day—so long as there's a profit." Dr. Sandor readily concedes that he's been hurt in new issues, particularly in 1962.

It was the lust for new issues which led Dr. Sandor to the defendants. He thought he saw through them a means of learning of new offerings in which he could speculate. The parties learned of each other in the following way.

Dr. Sandor met the defendant Charles Ruffer socially in California in either 1960 or 1961. Ruffer had made known to his friend Larry Smith that he planned to go into the over-the-counter brokerage business in New York and asked him if he had any interest in going into it. Dr. Sandor was apparently a client of Smith and Smith mentioned this opportunity to Dr. Sandor,

who expressed an interest in putting in some capital since he saw the proposed new venture as a vehicle which might provide Dr. Sandor with access to new security offerings. Seemingly, Smith also spoke of the proposed new firm to his brother-in-law, the plaintiff, Holiday.

There were at least two usual ways in which a brokerage firm could be organized; either as a limited partnership, with general partners to operate the business and limited partners to provide capital at interest and possible profit shares; or, as a corporation with limited liability for everybody. The individual defendants chose the corporate form.

Accordingly, the individual defendants formed a New York corporation, the corporate defendant herein which was registered with the SEC to engage in business as a broker-dealer. The corporation employed two retail salesmen and they and the individual defendants who were officers of the corporation made up its organization and together with the two plaintiffs became the stockholders of the business.

Dr. Sandor testified that he knew that Ruffer and Ballan were knowledgable and competent and had a following in the brokerage field. He hoped that with favorable markets the new firm would make money.

The investments by the six stockholders in about June of 1961 represent all the capital contributed to the corporation which is reflected in stock issued by the corporation as follows:

| | Amount Paid | Issued Class B Non-Voting | Issued Class A Voting |
|---|---|---|---|
| Andrew A. Sandor | $12,500 | 5 | |
| Alfred Holiday | 12,500 | 5 | |
| Leonard Gappelberg | 10,500 | 4.2 | |
| Robert Schwartz | 1,000 | .4 | |
| Charles Ruffer | 3,125 | 11.25 | 30 |
| Eli Ballan | 3,125 | 11.25 | 30 |
| | | 37.10 | 60 |

The stockholders of the corporation entered into a stockholders' agreement placing restrictions on the sale of their stock and providing among other things for options to the corporation on the shares of any stockholder seeking to dispose of his investment and if not exercised by the corporation then options to the remaining stockholders on any stock offered for sale.

The corporation started doing business in September, 1961. Most of the business done was a brokerage commission business, not dealer transactions and there was very little underwriting. The total revenues until April 30, 1962 were about $48,400 for a net loss of $654.72.

In June, 1962 the stock of the corporation was reclassified into one class of voting shares to be issued for each share outstanding, so as to retain the same proportionate capital interests. This step was with a view to seeking new capital for the firm by a public offering of its stock. Other incidental changes were made in the charter also, all with consent of 100% of the stockholders. June, 1962 was a period of a sharp break in the stock market and many small firms had been going out of business. The purpose of the corporate steps was to create capital to take advantage of what seemed a recent market turn around. The officers believed that success could be achieved with additional

capital. However, no new capital was thereafter acquired and the business history, except for a profit of $165.00 in 1964 and $1,700.00 in 1965 showed losses in each subsequent year of operations and was finally terminated in about November, 1966.

Pursuant to the amendment of the Certificate of Incorporation on or about November 2, 1962, the capital structure of the corporation reflected the following stockholders and their common stock ownership in the corporation:

(a) Andrew A. Sandor, 12,500 shares of common stock.

(b) Alfred Holiday, 12,500 shares of common stock.

(c) Leonard Gappelberg, 10,500 shares of common stock.

(d) Robert Schwartz, 1,000 shares of common stock.

(e) Charles Ruffer, 103,125 shares of common stock.

(f) Eli Ballan, 103,125 shares of common stock.

At no time did the defendants obtain from the Commissioner of Corporations of the State of California any permit to solicit for sale, offer, sell, or issue shares of the Class B stock or common stock of the defendant corporation.

The Class B stock and the common stock issued to each plaintiff were kept at the premises of the defendant corporation in New York and never delivered to plaintiffs in California.

Andrew A. Sandor resold a portion of his stock interest in the corporation for $7,500 in December 1964 to William Schworer, Campbell Lukas, Esq., and Malcolm Lukas, Esq. This sale took place in California and all parties to such transaction were residents of the State of California and none of these parties obtained a permit from the Commissioner of Corporations in the State of California to commence and effectuate such sale.

Self-evidently, the shares of the stockholders in the corporation became worthless at least as early as 1966.

The plaintiffs contend that to induce them to participate in the brokerage firm, the defendant, Ruffer in substance falsely represented that

(a) Ruffer and Ballan had great contacts and the Company was certain to make a great deal of money;

(b) Ruffer was investing all of his assets in the Company;

(c) the plaintiffs, as purchasers of the Company's stock, would be in a favored position with respect to allotments of new "hot" issues;

(d) the Company would split its stock and "go public" in the near future in the "hot market";

(e) plaintiffs would "make a mint" out of the purchase of the Company's stock;

(f) the demand for the Company's Class B stock was so great that they could sell as much stock as they wished; and

(g) a certificate evidencing the Class B stock purchased by each plaintiff would be delivered immediately to him.

The plaintiffs further contended that to induce them to agree to the reclassification of their stock they were given false information as to the purposes thereof.

The defendant Ruffer denied the substance of each of the asserted misrepresentations charged by the plaintiffs.

On the basis of the demeanor evidence, the circumstances, probabilities and the explanation of the defendants, the Court finds that the plaintiffs have failed to sustain their burden of proof of any misrepresentations to them and of their alleged reliance on the defendants' statements to induce their investments and purchases and the Court resolves all issues of credibility herein in favor of defendants.

Remaining for decision are the two claims alleging violations of the California Corporate Securities Act.

In their fourth and fifth claims for relief, plaintiffs contend that the California Corporate Securities Act renders illegal the original sale of stock in June, 1961 as well as the subsequent recapitalization in November, 1962 because both were effected by defendants without securing the permit required by California law. As a consequence of this illegality, plaintiffs seek recission of the transactions and each demands the return of the $12,500 consideration he paid for the stock.

Plaintiffs contend that their fourth and fifth claims for relief sound in fraud and therefore this action is not barred by the statute of limitations because commenced within three years from their discovery of the fraud; plaintiffs contend that they did not discover the failure to secure a permit until December 4, 1964.

*The Original Sale*

Cal.Corp.Code § 25500 (West 1955) provides as follows:

Permit for sale of securities of company's own issue. No company shall sell any security of its own issue, except upon a sale for a delinquent assessment against the security made in accordance with the laws of this State, or offer for sale, negotiate for the sale of, or take subscriptions for any such security, until it has first applied for and secured from the commissioner a permit authorizing it so to do.

Section 25009 of the Code defines the term "sale" in pertinent part as follows:

Sale; sell. (a) "Sale" or "sell" includes every disposition, or attempt to dispose, of a security or interest in a security for value.

"Sale" or "sell" includes all of the following, whether done directly or by an agent, circular letter, advertisement, or otherwise: An offer to sell; an attempt to sell; a solicitation of a sale; an option of sale; a contract of sale; a taking of a subscription; an exchange; any change in the rights, preferences, privileges, or restrictions on outstanding securities.

Section 26100 provides in pertinent part:

Void securities; issuance or sale without permit or in violation of permit. Every security of its own issue sold or issued by any company without a permit of the commissioner then in effect authorizing the issuance or sale of the security is void. * * *

■ The California statute was designed to prevent deception, exploitation of ignorance, and all unfair dealings in the issuance of securities. To that end, the law requires "issuers" of securities to obtain a permit in connection with an original issue of non-exempt securities. (Exempt securities are listed in Cal.Corp. Code § 25100 (West 1955). None are relevant to the case at bar).

It becomes necessary therefore to consider whether there was a transaction within the purview of the permit requirement and whether the absence of a permit constitutes "fraud" for purposes of the limitary periods when there has been a sale in California without a permit.

The prohibitions of the statute expressly apply to offers, negotiations, subscriptions, executory contracts and other preliminary acts leading up to the final act of performance, and are not limited to the actual issuance of the security or the actual "transfer of title". See, e. g., B. C. Turf & Country Club v. Daugherty, 94 Cal.App.2d 320, 210 P.2d 760, 765–766 (1949); Robbins v. Pacific Eastern Corp., 8 Cal.2d 241, 65 P.2d 42, 62 (1937). See also, T. W. Dahlquist, Regulation and Civil Liability Under the California Corporate Securities Act: I, 33 Cal.L.Rev. 343, 353 (1945).

Recent lower court cases have held that where a foreign corporation solicits in California a sale of stock of its own issue without first securing a permit, even though, in good faith, the eventual issuance of stock and the transfer of title are to take place in a foreign state, a permit is necessary, see, e. g., Coutts v. Grant, 184 Cal.App.2d 255, 7 Cal.Rptr. 431, 434 (1960); People v. Sears, 138

Cal.App.2d 773, 292 P.2d 663, 674 (1956), and that this requirement is not an unconstitutional burden on interstate commerce.

In B. C. Turf & Country Club v. Daugherty, 210 P.2d at 765 the Court stated:

> From a standpoint of interpretation, there can be no reasonable doubt but that these provisions of the statute require a foreign corporation to secure a permit to solicit a sale of its stock in this state, or to engage in preliminary negotiations looking towards such sale, even though the issuance of the securities and the transfer of their title will, in good faith, be completed in a foreign state. * * * We also have no doubt that, although such a regulation may impose some restraint on interstate commerce and place some restriction on free speech, it is a valid exercise of the state's police power, and is not unconstitutional.

The only California Supreme Court case dealing with the application of the statute to the preliminary dealings of a foreign corporation declined to expressly rule on whether California law prohibited preliminary transactions without a permit, but merely assumed without deciding that the preliminary transactions involved in that case would in fact have been unlawful. Operating upon this assumption, the Court held that even if the prior contract to make a sale was illegal if title to the stock passed outside of California and the stock was issued out of the state, the actual sale was not tainted by any earlier illegality. Robbins v. Pacific Eastern Corp., 8 Cal.2d 241, 65 P.2d 42 (1937) (hereinafter "Robbins"). The Court also held that the place where title is transferred is the place where the parties intend to deliver the stock certificates.

An extensive, exhaustive analysis of the California cases has concluded that the lower court cases relating to preliminary transactions seem to be in hopeless conflict and confusion. T. W. Dahlquist, Regulation and Civil Liability Under the California Corporate Securities Act: I, 33 Cal.L.Rev. 343, 353–356 (1946) (hereinafter sometimes cited as "Dahlquist"). Some cases award the buyer-plaintiff affirmative relief where preliminary transactions illegally transpired without a permit, despite the fact that the ultimate sale outside the state was considered valid. Other cases refuse to award relief, follow the *Robbins* case and hold that the sale is not tainted by the illegality of the preliminary negotiations. The author of the above cited article comments that the courts "have taken a pragmatic approach to the problem relating to preliminary transactions", *Dahlquist* at 354, by sustaining the validity of securities issued subsequent to unlawful preliminary transactions where there is a clear absence of fraud or intent to evade the statutes, *Dahlquist* at 356, although neither fraud nor intent to evade the statute are really prerequisites to liability.

█ This Court need not, however, grapple with the inconsistencies of California law because it is clear that the type of preliminary negotiations engaged in in California in the case at bar do not fall within the intent of the California statute.

It is quite apparent from the testimony adduced at trial that neither Charles Ruffer nor Eli Ballan solicited the sale of stock or investment in Ruffer, Ballan & Co., Inc. in California.

The language of B. C. Turf & Country Club v. Daugherty, 210 P.2d at 766–767, is directly in point:

> In one sense, any talk that ultimately leads a prospect to invest in the enterprise is solicitation. But it is quite obvious that the term was not used in that sense in the statute. * * * The courts must approach this problem with some degree of realism. If all preliminary talk in this state about organizing or financing or reorganizing a proposed foreign corporation requires a permit, then no such "talk" can ever lawfully take place in this state, because no permit can be secured to permit such talk. * * * If it is apparent or reasonably infera-

ble that there is fraud or exploitation present, or that the so-called preliminary negotiations are a sham, or that there is an intent to evade the California statute, there can be no doubt that the Commissioner has the power to interfere and that the statute is applicable. But where, * * * these elements are not present, it is clear that the statute does not and constitutionally could not prohibit an exchange of views or a general discussion of a plan of organization. A business conversation preliminary to any fixed plan is not prohibited.

The Court concludes that the original sale of stock and any negotiations leading up to that sale do not fall within the provisions of the California law which requires a permit for the sale of securities.

■■■ Moreover, application of the *Robbins* case to the facts of the case at bar also leads the Court to the conclusion that the original sale of securities was valid.

The "sale" of stock took place in New York, because the issuance was there, and transfer of title appears to have occurred there. The California courts hold that title passes at the place where the parties intend to effect delivery of the stock certificates. In the case at bar the certificates were never delivered to the plaintiffs. But it is axiomatic that where there is a new issue of securities, the mere issuance passes title to the buyer and the certificates need never be delivered for title to pass because they are merely evidence of the ownership. *See, Robbins*, 65 P.2d at 59.

In conclusion, whether we view the facts of this case as constituting the type of preliminary transactions which are not covered by the Act, or we apply the approach of the *Robbins* case, the initial sale of stock was valid in all respects.

Language in the *Robbins* case is an apt characterization of what the plaintiffs in this case are trying to do:

* * * plaintiffs, * * * got exactly what they wanted and what they bargained for—where no fraud or imposition has been proved—and * * * they are now trying to recoup their losses, by a strained and technical construction of the contract, from what turned out to be a bad bargain. *Robbins*, 65 P.2d at 59.

This is the type of case where courts should not give "assistance to those who have heedlessly followed the phantom of speculation into questionable realms". Pollak v. Staunton, 210 Cal. 656, 666, 293 P. 26, 30 (1930).

### Statute of Limitations

■■■ Assuming arguendo that California law invalidated the transaction at bar, plaintiffs' claims are nevertheless barred by the applicable statute of limitation. The Court's discussion *infra* of limitations periods in connection with the recapitalization claim applies to the claim respecting the original sale of stock and the Court hereby concludes that this claim is also barred by the limitations period.

### The Recapitalization—November 2, 1962

Recapitalization of the corporate structure does not fall within the category of preliminary transactions discussed above in connection with the original sale of stock.

The question for decision here is whether a foreign corporation seeking to recapitalize, and needing the consent of the shareholders to do so, must acquire a permit under California law before it can solicit the necessary consent of shareholders who are residents of California.

Literal interpretation of the statute, which requires a permit where there is any "exchange; any change in the rights, preferences, privileges, or restrictions on outstanding securities," Cal.Corp.Code, § 25500, and the fact that a recapitalization is an original issue, taken together with the fact that the statute has been interpreted by the California courts to apply with like force to

foreign as well as domestic corporations, lead to the conclusion that a permit is required to recapitalize. *See* Dahlquist, 33 Cal.L.Rev. at 349, n. 10, 352; Dahlquist, Regulation and Civil Liability Under the California Corporate Securities Act: II, 34 Cal.L.Rev. 344, 350 (1946). There is however no decisional law on this subject. 34 Cal.L.Rev. at 357.

Dahlquist observes that if the statute does in fact apply to foreign corporations recapitalizing outside the state which seek the consent of California shareholders, many corporations have been violating the law. 34 Cal.L.Rev. at 392–393. Because he fears that the language of the statute applies to recapitalizations he suggests that until the question is clarified, or the statute is amended, foreign corporations should secure permits.[1]

We need not, however, decide whether the consent of the plaintiffs in the case at bar required a permit because the applicable statute of limitations bars plaintiffs' claims.

*The Statute of Limitations*

 While the precise nature of civil liability under the California statute is unclear, *see* Dahlquist, Regulation and Civil Liability Under the California Corporate Securities Act: III, 34 Cal.L.Rev. 543, 554–560 (1946), it is clear that a purchaser may sue the issuer of securities and all those who participate in the illegal issue for either recission or damages. *See* Mary Pickford Co. v. Bayly Bros., Inc., 12 Cal.2d 501, 86 P.2d 102 (1939); Dahlquist: III, 34 Cal.L.Rev. at 584.

There is no express limitations period in the statute, and the period is, as the Court will illustrate, related to the theory of a plaintiff's suit. The earliest cases held that a buyer could sue on the theory of breach of warranty or for fraud. If the former, the action would be barred two or three years (see Opinion of the Court *infra* at p. 25) from the date of the issuance of the stock; if the latter, the action was not barred until three years after the buyer's discovery of the seller's lack of a permit.

In the leading case of Mary Pickford Co. v. Bayly Bros., Inc., 12 Cal.2d 501, 86 P.2d 102 (1939), and the companion case of Bartlett v. Suburban Estates, 12 Cal.2d 527, 86 P.2d 117 (1939), the California Supreme Court held that before an action could be maintained on the theory of fraud or deceit, actual or implied fraud would have to be alleged and proved and would not be conclusively presumed. Thus the theory that the buyer of securities where no permit was secured had a cause of action for fraud under all circumstances was overruled. 86 P.2d at 112–113.

The Court explained that to establish fraud in the failure to secure a permit, the buyer must show that the seller knew or in the exercise of reasonable diligence should have known that his representations were false. Put differently, if the seller acted upon information sufficient to justify a reasonable man in concluding that no permit was required, he is not liable in fraud even though he was mistaken.

The Court stated 86 P.2d at 114:

\* \* \* a person who sells a security impliedly represents that a permit therefor has been secured when one is required by the Corporate Securities Act for such a sale. If this implied representation is false, then it is a negligent misrepresentation which is an actionable fraud, and the buyer's right of action does not accrue until he discovers its falsity *unless the seller acted upon information sufficient to justify a reasonable man in con-*

---

1. The entire statute governing permits has been repealed and a new statute was enacted effective January 2, 1969. *See* Cal.Stats.1968, c. 88 p. 280, § 2, Cal. Corp.Code § 25500 et seq. (West Supp. 1969). There is a new section expressly governing recapitalizations and reorganizations, but it sheds no light on this problem. The new statute is by its terms inapplicable to actions pending before its effective date. *See,* Cal.Corp.Code § 25704(a) (West Supp.1969).

*cluding that no permit was required. In that event there has been a breach of warranty, but no fraud, and the buyer's cause of action accrues at the date of sale.* (emphasis added)

The opinion is woefully unclear. Though it states that fraud is no longer to be conclusively presumed, but must be proved, in reality, it allows an action for implied misrepresentation i. e., fraud, unless the seller sustains the burden of proving that he acted reasonably when he failed to secure a permit. The opinion is silent on how the seller is to prove he acted reasonably in his failure to secure a permit.

Dahlquist summarizes the holding of the case in the following manner:

> [T]here is only a *prima facie* presumption of *implied* misrepresentation, which can be rebutted by evidence showing that the defendant had reasonable grounds for believing that a permit was not required, the burden of proof being on the defendant. If the defendant proves that he honestly believed that no permit was required, and acted on information sufficient to justify a reasonable man in so concluding, this negatives or refutes any fraud, and even though the defendant was mistaken in his belief, the claim is solely for breach of warranty and the cause of action accrues at the date of sale. If, on the other hand, the defendant fails to meet such burden of proof—the presumption of implied misrepresentation thereby remaining unrebutted—the cause of action may be commenced at any time within three years after the discovery of the violation. Dahlquist: IV, 34 Cal.L. Rev. at 704.

Applying the *Pickford* and *Bartlett* cases to this case, the result is that limitations are a bar herein.

If this action sounds only in breach of warranty, the warranty was broken at the date of recapitalization November 2, 1962, (or the date of original sale on the fourth claim for relief, which was June, 1961), and commenced to run at that time. The causes of action for breach of warranty were therefore barred prior to the commencement of this action in February, 1966.[2]

Neither, *Pickford* nor *Bartlett* indicated what type of showing a seller must make to establish that he acted on "information sufficient to justify a reasonable man in concluding that no permit was necessary".

In *Pickford*, the defendants were held to have acted fraudulently because the evidence disclosed that the defendants had made various fraudulent misrepresentations in connection with the sale of stock and had affirmatively represented that the stock was valid.

In *Bartlett*, failure to secure a permit and nondisclosure of that fact were held not to be fraudulent. The Court, addressing itself to the "question of fact —whether the sellers acted reasonably", 86 P.2d at 118, stated that none of the plaintiffs relied upon or proved any representations concerning the validity of the securities sold other than those which may be implied from the issuance itself, and that *none of the defendants knew that a permit was required.* Seemingly, the fact that none of the defendants knew that a permit was required was reasonable in that case (although why it was reasonable is not discussed) and consequently defendants were not guilty of implied fraud.

In the more recent case of Maner v. Mydland, 250 Cal.App.2d 526, 58 Cal. Rptr. 740 (1967), there was evidence that defendant knew a permit was required and therefore the Court conclud-

2. *Pickford* did not decide whether breach of warranty is under Cal.Code Civ.Proc. § 339(1) governing "an action upon a * * * liability not founded upon an instrument of writing" with a limitation of two years, or under Cal.Code Civ.Proc. § 338(1) governing an "action upon a liability created by statute, other than a penalty or forfeiture", with a limitation period of three years. Application of either limitations period would bar the instant claims.

ed that failure to secure a permit was unreasonable and the buyer's cause of action sounded in fraud. See also Gormly v. Dickinson, 178 Cal.App.2d 92, 2 Cal.Rptr. 650 (1960) where the defendant seller had not inquired whether the corporation had the authority to sell the stock and a cause of action for fraud was sustained.

■ In the case at bar, neither of the plaintiffs proved that they relied on any actual representation that the stock was valid. Moreover, defendant Charles Ruffer credibly testified that he had no idea that a permit was required for either the original sale or the subsequent recapitalization. In view of the facts that it is not at all clear whether California law requires a permit for consent to the recapitalization of a foreign corporation; and that California law is unique in its far-reaching applicability to foreign corporations; and that few companies are aware of the need to secure a permit in this type of transaction; the Court concludes that the defendants acted reasonably in their failure to secure a permit and that therefore plaintiffs' claims do not sound in fraud.

■ Even if the Court assumed for argument's sake that defendants have failed to sustain the burden of proving that they acted on information sufficient to justify a reasonable man in concluding that no permit was required, the plaintiffs have failed to prove *when* they discovered the alleged fraud, i. e. the failure to secure a permit.[3]

The complaint alleges that the fraud was discovered on December 4, 1964 and that consequently both claims were not barred until December 1967. The action having been commenced in February 1966, was not, it is contended, time barred.

No proof at all was submitted with regard to Mr. Holiday's discovery of the alleged fraud.

Dr. Sandor is, as was indicated earlier, a sophisticated speculator in securities. Absent any concrete evidence to the contrary, it is reasonable to assume that Dr. Sandor was well versed in California securities law and was aware that a permit was generally required to transact business in securities in California. He was aware of this at the time of the original sale in June 1961 and at the time of the recapitalization in November 1962, although he may not have given the requirement much thought or may have deliberately disregarded it.

Even if the Court were to assume that Dr. Sandor did not know of the permit requirement, as the plaintiff, he possessed the burden in this case, as one suing for fraud, of negating his discovery of the fraud more than three years before the suit was commenced. This, he failed to do. There was no showing by Dr. Sandor that he had not discovered the fraud at any time prior to February 1963, and the circumstance of his sophistication ineluctably leads this Court to conclude that he had discovered the alleged fraud prior to February 1963.

Accordingly, the Court finds and concludes that both plaintiffs' fourth and fifth claims for relief under the California Corporate Securities law, lack merit in fact and are, moreover, barred by the statute of limitations.

■ Also remaining for decision at this time are plaintiffs' claims that they were damaged by the failure of the defendants to deliver the stock certificates to them. The defendants have been ready and willing to deliver the stock certificates to plaintiffs at the very least since the commencement of this action, but plaintiffs have refused to accept delivery.

There has been no indication whatsoever by competent evidence that there has been any loss or damage or other le-

---

3. Although knowledge of the buyer that a permit was not secured does not defeat the seller's liability under the Act and is irrelevant to it, (the buyer not being in *pari delicto* with the seller) this knowledge *is* relevant to the limitations period.

gal inconvenience to the plaintiffs from the nondelivery of the stock.

Accordingly, the Court finds and concludes that this claim likewise lacks legal and factual merit.

Judgment shall be entered herein in favor of defendants against plaintiffs, dismissing the complaint, with costs.

The foregoing shall constitute the findings required by Rule 52(a), Federal Rules of Civil Procedure, and the Court's conclusion thereon.

So ordered.